NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0585n.06

Nos. 15-3988, 15-3990, 15-3991, 15-4003, 15-4028

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Oct 24, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| KENNETH FLOWERS; TERRANCE CHAPPELL; | ) | COURT FOR THE NORTHERN |
| KALI ALEXANDER; RASHEAM NICHOLS; | ) | DISTRICT OF OHIO |
| JUSTIN MAXWELL, | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |

BEFORE: SUTTON and STRANCH, Circuit Judges; STEEH, District Judge

**PER CURIAM.** This case is one in a long series of elaborate, nearly-identical sting operations conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). In these operations, referred to as "stash house stings," an undercover agent recruits individuals to steal a large quantity of drugs from a house protected by an armed guard. The house, the drugs, and the guards, however, are all fictional—and would-be participants are arrested before they reach the invented location. After such a sting operation, Kali Alexander, Terrance Chappell, Kenneth Flowers, Justin Maxwell, and Rasheam Nichols were arrested, tried, and convicted of conspiracy to possess with intent to distribute five or more kilograms of cocaine and using or carrying a firearm during and in relation to a drug conspiracy. The Defendants appeal their convictions and their sentences on various grounds. We **AFFIRM**.

## I. BACKGROUND

The "stash house sting" that led to Defendants' convictions was orchestrated by ATF Special Agent Richard Zayas. The ATF has specific protocols for conducting stings on fictional drug "stash houses," and Zayas himself has made a career of coordinating the stings, having worked on or been involved with over 100 similar scenarios across the country. This was his first stash house sting in Cleveland.

To identify a target for the sting, Zayas directed two informants, referred to as #2302 and #9097 (working for pay and to reduce a sentence, respectively) to go into the community and return with general information. Informant #2302 approached Alexander and discussed selling firearms, but the sale never occurred. Alexander later agreed to sell the informant ten grams of heroin. The informant brought up the idea of a potential robbery with Alexander, but this meeting was not recorded and Zayas did not know what was discussed. On the day of the heroin sale, both informants and Zayas met with Alexander, who sold them approximately 6.5 grams of heroin for $900 that was provided by the ATF. The meeting occurred in an undercover vehicle and was recorded.

Zayas then proposed the idea of robbing a cocaine stash house to Alexander, presenting himself as a disgruntled drug courier who felt he was being treated unfairly. He specified that the house would have eight to nine kilograms of cocaine and be guarded by two men, one armed with a gun. Zayas discussed splitting the cocaine 50/50 with Alexander and whoever else assisted with the robbery.

The following week, Alexander brought Nichols to meet with Zayas, who explained the scenario to him. Zayas asked if Nichols knew what he was doing, and Nichols indicated that he did. The next week, Alexander brought Maxwell to meet with Zayas, who again discussed the

details of the plan and asked if the men needed a car to use on the day of the robbery. They said that they did.

On the day of the proposed robbery, Alexander, Nichols, and Maxwell met the informant on the east side of Cleveland, bringing along Chappell and Flowers. The informant drove the men to meet Zayas at a CVS Pharmacy across town. On the video recording of the drive, Alexander is sitting in the front seat and the other four defendants are in the back; both Flowers and Nichols are holding firearms. When the vehicle arrived at the CVS, Zayas entered the car and took approximately four minutes to describe the robbery to the men  This was the first and only time he spoke with Flowers or Chappell. At trial, Zayas testified that the Defendants spoke about the plan, asked him questions, and were attentive. He again told them that the house contained eight to nine kilograms of cocaine and was guarded by two men, one with a gun.

After the discussion, the informant drove the Defendants to a warehouse about three blocks away where they were arrested after exiting the car. Chappell ran and climbed a fence but soon surrendered to police at gunpoint. All of the Defendants had firearms except Chappell, but Special Agent Daniel Forster testified that he heard and saw a firearm drop from Chappell's person while he was running.

On September 23, 2014, the Defendants were charged in an eleven-count indictment. All five Defendants were charged with conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846 (Count 2) and with using or carrying a firearm during and in relation to a drug conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Counts 3–7). Alexander was charged with distributing 5.5 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 1). Alexander and Nichols were charged with being felons in possession of ammunition, in violation of 18 U.S.C.

§ 922(g)(1) (Counts 8–9). Maxwell and Chappell were charged with being felons in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g) (Counts 10–11). Flowers had no criminal record.

The Defendants moved for separate trials on the basis that a joint trial would compromise their Sixth Amendment Confrontation Clause rights. Their motion was denied. The Defendants also filed a pre-trial Motion to Preclude Sentence Enhancement, objecting to the ten year mandatory minimum sentence because it was the result of sentencing manipulation and thus violated due process. The district court indicated that this issue would be more appropriately raised at sentencing. The Defendants were tried together before a jury.

The parties contested the amount of cocaine at issue in the conspiracy; the Defendants argued that their intention and agreement was to take half of the cocaine and that the arbitrarily selected amount of fictional drugs constituted sentencing manipulation. Zayas testified that the fictional amount of cocaine originated in a conversation with Special Agent Johnson and the local police department and that it was intended to mimic the average quantity in a Cleveland stash house. Zayas had not seen any documentation confirming that number and Johnson was not able to point to any when he testified.

During rebuttal closing argument, the prosecutor stated that every time jurors had been asked to consider a lower amount of cocaine, they were being "invited to violate [their] oath as jurors." The Defendants moved for a mistrial, which was denied. At the close of evidence, the Defendants moved for a judgment of acquittal, and renewed it after the defense rested. The Defendants were convicted on all counts and, by Special Verdict Form, the jury found that the amount of cocaine involved in the conspiracy was more than five kilograms, triggering a mandatory minimum sentence.

At sentencing, the district court overruled the Defendants' sentencing manipulation and due process objections. Alexander was sentenced to concurrent terms of 151 months of imprisonment on Counts 1 and 2 and 120-months on Count 8, and a consecutive 60-month term on Count 3. Nichols was sentenced to concurrent terms of 121 months of imprisonment on Count 2 and 120 months on Count 9, and a consecutive term of 60 months on Count 4. Maxwell was sentenced to concurrent terms of 121 months on Count 2 and 120 months on Count 10, and a consecutive term of 60 months on Count 5. Chappell was sentenced to concurrent term of 121 months of imprisonment on Count 2 and 120 months on Count 11, and a consecutive term of 60 months on Count 6. Flowers was sentenced to 120 months on Count 2 and a consecutive term of 60 months on Count 7.

The Defendants appeal their convictions and their sentences on various grounds.

## II. ANALYSIS

### A.      The outrageous government conduct defense

Alexander, Chappell, Maxwell, and Nichols challenge the district court's denial of their motion to dismiss the indictment based on outrageous government conduct. They argue that the Government's conduct "created and encouraged the defendants' commission of the offense by luring the impoverished . . . defendants with the promise of a large payoff, making repeated requests for meetings over a short period of time, making repeated demands for their commitment to the conspiracy, suggesting and enabling their possession of firearms, by providing transportation via the confidential informant to a pre-robbery meeting, and by providing them with a car to use for purposes of the robbery." In examining whether the indictment could have been dismissed based on this defense, we review the district court's conclusions of law de novo. *United States v. Amawi*, 695 F.3d 457, 483 (6th Cir. 2012).

Under the outrageous government conduct defense, government involvement in a crime may be "so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011). Under the defense, the government's conduct alone could bar prosecution, regardless of a defendant's predisposition. *United States v. Tucker*, 28 F.3d 1420, 1422, 1424 (6th Cir. 1994). The outrageous government conduct defense is distinct from the defense of entrapment, which focuses on a defendant's intent or predisposition to commit the crime. *Sherman v. United States*, 356 U.S. 369, 372 (1958) ("To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."); *Sorrells v. United States*, 287 U.S. 435, 451 (1932).

In *Tucker*, we stated that "there is no authority in this circuit which *holds* that the government's conduct in inducing the commission of a crime, if 'outrageous' enough, can bar prosecution of an otherwise predisposed defendant under the Due Process Clause of the Fifth Amendment." 28 F.3d at 1424. Thus, we have not adopted the due process defense of inducement. *United States v. Warwick*, 167 F.3d 965, 974 (6th. Cir. 1999) ("[W]e have consistently rejected defendants' attempts to argue that the government's conduct in inducing them to commit the crimes charged was so outrageous as to deprive them of their constitutional rights."). We therefore affirm the district court's denial of the motion to dismiss the indictment.

**B.    The entrapment defense**

Flowers argues that his motion to dismiss should have been granted on indirect or vicarious entrapment grounds, and that his trial counsel was ineffective for failing to seek an entrapment jury instruction.

    1.    *Vicarious or indirect entrapment*

Flowers argues that he lacked predisposition and that vicarious or indirect entrapment justifies dismissal because he had no prior record, was employed, and was induced by his cousin. The Government counters that Flowers was predisposed because he was not recruited by the Government, brought a loaded firearm the day of the robbery, did not express hesitation, and did not experience repeated or persistent Government solicitation.

This Court reviews a district court's refusal to dismiss an indictment for an abuse of discretion. *United States v. Middleton*, 246 F.3d 825, 841 (6th Cir. 2001). The defense of entrapment requires government inducement and a lack of predisposition to engage in the criminal activity. *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011). Indirect or vicarious entrapment occurs when "a person is brought into a criminal scheme after being informed *indirectly* of conduct or statements by a government agent which could amount to inducement." *United States v. McLernon*, 746 F.2d 1098, 1108 (6th Cir. 1984) (quoting *United States v. Valencia*, 645 F.2d 1158, 1168 (2d Cir. 1980)). In *McLernon*, we noted the concerns involved when a private party serves as a third-party agent of the government, or when the parties have a "special relationship" such that the "governmental pressure upon one member" can "overcome the will of another member to a greater degree by virtue of that relationship." *Id.* at 1108–09. The Sixth Circuit has "explicitly chosen not to adopt the doctrine of indirect entrapment," *Poulson*, 655 F.3d at 502; however, we have "upheld the entrapment defense where the inducement is initiated by government officials or by private citizens acting as their agents upon their instructions or directions," *McLernon*, 746 F.2d at 1109. Here there is no evidence that the Government used Alexander as a private agent in order to incriminate Flowers.

Accordingly, the district court did not abuse its discretion in denying Flowers's motion to dismiss.

### 2.      *Ineffective assistance of counsel*

Flowers argues that his trial counsel was ineffective for failing to seek an entrapment jury instruction.  This court reviews de novo a criminal defendant's ineffective assistance of counsel claim, which is a mixed question of law and fact.  *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003).  We do not address these claims on direct appeal unless the "the existing record is adequate to assess properly the merits of the claim."  *United States v. Hynes*, 467 F.3d 951, 969 (6th Cir. 2006) (quoting *United States v. Franklin*, 415 F.3d 537, 555–56 (6th Cir. 2005)).  "[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."  *Massaro v. United States*, 538 U.S. 500, 504 (2003).

Defense counsel for Flowers raised the issue of entrapment in a joint pretrial motion to dismiss, which was denied.  *United States v. Alexander*, No. 1:14 CR 341, 2015 WL 1523910, at *3 (N.D. Ohio April 3, 2015).  In a chambers conference that was not recorded, his defense counsel informed the district court that they were not asking for the entrapment defense instruction.  Flowers argues that this constituted deficient and prejudicial performance, as entrapment was essentially his only defense, especially considering that Flowers was in the unique position among his co-Defendants of having no previous criminal record.  Defense counsel's reasons for not requesting the entrapment instruction are not before us and the record is not adequate to properly address the merits of this claim.  This issue is more appropriately resolved in a post-conviction proceeding.

## C.     Confrontation Clause violation

Several Defendants argue that the introduction of a co-Defendant's statement and limitations on cross examination of federal agents violated their Sixth Amendment rights.

### 1.     *Co-defendant's statement*

Appellants Chappell, Maxwell, and Nichols argue that the introduction of incriminatory testimonial statements from their co-defendant Alexander violated their rights under the Confrontation Clause. We ordinarily review a district court's evidentiary rulings for an abuse of discretion, *United States v. Rodriguez–Lopez*, 565 F.3d 312, 314 (6th Cir. 2009), but "review de novo claims that the admission of evidence violated the Confrontation Clause," *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009). Maxwell objected the second time the statement was referenced during cross-examination, which is sufficient to preserve the issue.

An out-of-court statement made by a non-testifying co-defendant that inculpates another defendant violates the Confrontation Clause, even when the court gives a limiting instruction. *Bruton v. United States*, 391 U.S. 123, 128–33 (1968). The Supreme Court has provided additional guidance on this principle. In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Court held that the Confrontation Clause was not violated by the admission of a non-testifying co-defendant's statement with a limiting instruction because there the statement was "redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211. In *Gray v. Maryland*, 523 U.S. 185 (1998), the government redacted the co-defendant's confession by substituting a blank space or the word "deleted" for the defendant's name in the confession. 523 U.S. at 188. The Court explained that this testimony violated *Bruton* because it still referred directly to the existence of the defendant. *Id.* at 188, 191.

A Sixth Amendment violation might be avoided in a joint trial if the defendant's name is redacted and a neutral term is substituted. In *United States v. Vasilakos*, 508 F.3d 401, 408 (6th Cir. 2007), the government was prosecuting five defendants in "a multifaceted conspiracy in which several individuals engaged in activities," and the non-testifying co-defendant's statements "did not ineluctably implicate" the other co-defendants. *Id.* at 408. In *Stanford v. Parker,* 266 F.3d 442, 456 (6th Cir. 2001), however, two defendants were on trial and the government read a confession into evidence, replacing the name of the co-defendant with the phrase "the other person." *Id.* at 457. The district court found a *Bruton* violation because the jury would have concluded "the other person" referred to the co-defendant and we affirmed this principle. *Id.*

"Where a *Bruton* violation occurs, a court must then determine whether that violation is harmless." *Id.* at 456. This entails determining whether the "minds of an average jury" would have found the government's case "significantly less persuasive" without the incriminating part of the co-defendant's statement. *Id.* (quoting *Hodges v. Rose*, 570 F.2d 643, 648 (6th Cir. 1978)).

Before trial, all five Defendants moved for separate trials based on their concern that a joint trial would compromise their Sixth Amendment Confrontation Clause rights. They stated that all the Defendants gave custodial statements to federal agents or local police that implicated other Defendants. *Id.* The Government conceded that the post-arrest statements implicated *Bruton*, but said it would redact the statements to alleviate any Sixth Amendment concerns. *Id.* The district court found this acceptable, noted that it could provide a limiting instruction, and declined to sever the trials. *Alexander*, 2015 WL 1523910, at *5.

None of the Defendants testified at trial. However, Detective Tom Hodous testified on direct examination about Alexander's post-arrest statement regarding whether the Defendants planned to take half or all of the drugs:

> Q: Okay. And did [Alexander] indicate that that understanding had changed at some point?
> HODOUS: Yes.
> Q: And how had it changed?
> HODOUS: He said that [Zayas] would not get any of the portion of the narcotics, *that they would take all of it*.

(R. 181, PAGEID# 5477) (emphasis added). And again on redirect:

> Q: And [Alexander] indicated to you that the agreement that he had with [Zayas] was to split these bricks of cocaine half and half, is that fair?
> HODOUS: That's correct.
> Q: And in his interview, did he indicate whether he had provided that -- the details of that agreement *to others*?
> HODOUS: Yes.
> Q: Okay. And after having done that, did he indicate *how the agreement between him and others changed*?
> HODOUS: Yes.
> Q: And what did he indicate *they had come to the conclusion* of as to what the split would be at that point?
> MS. PETTINELLI: Objection.
> HODOUS: That they were not --
> THE COURT: Overruled. Go ahead.
> HODOUS: That there would not be a split and that *they would take all the bricks* of cocaine.

(R. 181, PAGEID# 5498–99) (emphasis added). The Government referenced the statements in closing argument: "The idea of the 50-50 split from Agent Zayas was never intended to happen according to Kali Alexander." The court did not give a limiting instruction during cross examination or at the close of the evidence to indicate that the jury could not consider Alexander's post-arrest statements against the other Defendants.

The Defendants argue that although the statement admitted did not refer to each of them by name, it was an obvious reference to them. Just a few minutes earlier in his testimony, Hodous said that Alexander identified "the other individuals that he had been arrested with" as "Sheam, Terrance, Justin, and Cash." The Government responds that the statement did not refer to any Defendant by name, and, citing to *Vasilakos*, that in a multi-defendant conspiracy, it is less clear to whom the terms refer. *See* 508 F.3d at 408.

As in *Vasilakos*, the statements admitted at trial used neutral terms and did not refer to any defendants by name. But in *Vasilakos*, five defendants were on trial and the statement at issue only referred to one individual. 508 F.3d at 405, 408. Here, the statement referred to an unspecified number of people—shortly following the identification of the four other Defendants—making it a likelier reference to the other Defendants who were on trial. The Government notes that the Court in *Gray* suggested "[m]e and a few other guys [beat the victim]" as an alternative to the improper redaction in the phrase "[m]e, deleted, deleted, and a few other guys [beat the victim]." 523 U.S. at 196. But the language "a few other guys" is less specific than "others" as stated at trial, especially when coupled with Alexander's identification of "the other individuals" as the four other Defendants just a few minutes earlier in Hodous's testimony.

Another issue implicates the Confrontation Clause. The analyses in *Richardson*, *Gray*, and *Vasilakos* assume the presence of a limiting instruction. *See, e.g., Richardson*, 481 U.S. at 211 (holding that the Clause was not violated by a redacted confession "with a proper limiting instruction"). Here, no limiting instruction was given to the jury at any point. *See Mikesell v. Conley*, 51 Fed. App'x 496, 505 (6th Cir. 2002) ("There is a real problem lurking here, nevertheless—one that removes the case from the permissible practice described in

*Richardson* and brings it within the realm of *Bruton*: the trial court did not instruct the jury that it was to consider [the co-defendant's] statement only against her, and not against [the defendant].").

The testimony given in this joint trial of five Defendants raises Confrontation Clause problems. On this record, however, there was sufficient evidence that the total amount of cocaine involved in the conspiracy was between eight and nine kilograms. *See United States v. Robinson*, 547 F.3d 632, 636–37 (6th Cir. 2008); *United States v. Watson*, 620 Fed. App'x. 493, 508–09, 510 (6th Cir. 2015) (stating that "the relevant quantity of drugs is the quantity involved in the overall conspiracy"). Given the evidence regarding the quantity of the cocaine involved in the conspiracy, we cannot say that the average juror would have found the government's case "significantly less persuasive" without the incriminating part of the co-defendant's statement. *Stanford,* 266 F.3d at 456 (quoting *Hodges*, 570 F.2d at 648). Thus, any violation was harmless error.

### 2. *Limitations on cross examination of federal agents*

Maxwell and Chappell further allege that the district court improperly limited their cross examination of Agents Zayas and Johnson. Exclusion of evidence is examined for an abuse of discretion, reviewing conclusions of law de novo and factual determinations for clear error. *United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

The Defendants argue that their right to confrontation was violated by unreasonable limitations preventing them from: 1) impeaching the credibility of the agents' claimed reason for selecting the quantity of cocaine; and 2) cross-examining Zayas on the credibility of his

testimony that there was an understanding that Defendants would take all the drugs, then distribute half of the drugs back to him "subsequently."

The Defendants argue that they were not trying to inform the jury of the potential sentence, rather they were trying to elicit factual information to support their sentencing manipulation argument:

> Q: The amount of drugs, 4 kilos versus 9 kilos, is significant in Federal Court in criminal cases, correct?
> MS. GALVIN: Your honor, I'm going to object and ask for a sidebar.
> THE COURT: Sustained.

(R. 180, PageID# 5258).

> Q: … [A]re you familiar with Title 21 of the United States Code?
> A: Yes.
> Q: Okay. And so, you're familiar with the federal laws as it relates to controlled substance offenses?
> MR. FLANNERY: Objection, Judge.
> THE COURT: Sustained.

(R. 182, PageID# 5573).

A jury should "reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). "[A]s a general matter, jurors are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense." *Id.* at 586–87. Upon review of the record, the Defendants were prevented from continuing their line of questioning when it delved into territory that might have informed the jury about the potentially increased sentences they were facing. Additionally, it appears trial counsel for Alexander did cross-examine Zayas regarding his statements about the agreement and when he would get his half of the cocaine. The district court's limitation on cross examination does not rise to the level of an abuse of discretion.

### D.    Prosecutorial misconduct

Alexander, Chappell, Maxwell, and Nichols contend that the Government engaged in misconduct when the prosecutor:  1) told the jury that it would not be at this trial if the ATF had done something illegal; and 2) said that the jury was being "invited to violate [its] oath" anytime defense counsel suggested that jurors consider an amount of cocaine less than eight or nine kilograms.  Defendants thus argue that the prosecutor engaged in misconduct by committing improper vouching and by impugning the integrity of defense counsel, respectively.

Whether a prosecutor's statements at trial amount to misconduct, and whether the statements render a trial fundamentally unfair, are "mixed questions of law and fact, which we review de novo."  *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009).  We view the conduct within the context of the entire trial.  *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).  In considering this issue, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974)).  To evaluate a claim of prosecutorial misconduct, we first determine whether the statements were improper.  *Carson*, 560 F.3d at 574.  If so, we determine if the remarks were flagrant, warranting reversal.  *Id.*  To determine flagrancy, we look to four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong."  *Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

"To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury." *Francis*, 170 F.3d at 550.

The Defendants argue that the prosecutor impugned the integrity of defense counsel by suggesting that the defense invited the jury to violate its oath:

> [GOVERNMENT]: After all the argument that you've heard and have been presented with, I'm going to stick to the law and I'm going to stick to your common sense, because *every single one of you has just been invited to violate your oath, your oath as jurors*, that you would consider the facts of the case, the evidence and the testimony presented, and the law supplied by the Court.
>
> . . .
>
> You have been invited to consider things that you are not allowed to consider. And the way that you know that you are not allowed to consider them is because it will be in the jury instructions.
>
> . . .
>
> Nowhere in there does it say that a defendant must have agreed to 8 to 9 kilograms. This is one of the most important points. *Every single person that invited you to consider 4 kilograms is asking you to violate your oath as jurors.*
> MR. DIXON: Objection.
> MR. MACK: Objection.
> THE COURT: It's argument. Overruled.
> [GOVERNMENT]: This is the jury instruction you're going to receive. This is exactly verbatim. "This does not require proof that the defendant knew that the drug involved was cocaine. It is enough that the defendant knew that it was some kind of controlled substance, nor does this require proof that the defendant knew how much was involved. It is enough that the defendant knew that some quantity was involved."
> Every time it was suggested that you consider 4 kilograms of cocaine, *you were invited to violate your oath.* Your oath requires to you consider these jury instructions.
> MR. FATICA: Objection, Your Honor.
> THE COURT: Overruled. It's argument.

(R. 182, PAGEID# 5695–96, 5698–99) (emphasis added).

The Defendants also argue that the prosecutor committed improper vouching in the rebuttal closing argument, by "suggesting to the jury that the Court had made a pretrial determination of the propriety of the ATF's conduct in this case."

> [GOVERNMENT]: Do you honestly believe anyone of us would be here right now if they had done something illegal? We wouldn't be here, ladies and gentlemen. These cases have been conducted across the country. They have been presented to juries across the country.
> MR. MACK: Objection, Your Honor.
> THE COURT: Sustained.
> [GOVERNMENT]: You would not be here if in this instance this Court had found that ATF had somehow violated the law.
> MR. MACK: Objection again.
> THE COURT: Overruled.

(R. 182, PageID#5696). At the close of the Government's rebuttal argument, all five Defendants moved for a mistrial based on the prosecutor's statements, which was denied.

Both challenged statements occurred in the Government's rebuttal argument. A prosecutor's statement to the jury that a defense argument is an invitation for jurors to "violate their oaths" is the more concerning. In cases charging a conspiracy, it is the province of the jury to determine if a conspiracy existed, its specific objectives, and who participated in it. Here, in addition to its general verdict, the jury was given a special interrogatory regarding the quantity of drugs involved—the issue addressed in the defense argument challenged. We find these comments improper.

We must next determine whether the prosecutor's statements were flagrant. The repetition of the remarks during rebuttal closing argument suggests that it was unlikely that they were accidental, and, as the statements were the last thing the jury heard from the attorneys and the Defendants did not have a chance to respond, may have been misleading to the jury. *See Carter*, 236 F.3d at 788. Both the test for flagrancy and the test determining whether an improper but non-flagrant statement should result in reversal of a conviction, however, consider the total strength of the evidence against the defendant. *Francis*, 170 F.3d at 550. The evidence of the Defendants' participation in the conspiracy to rob a stash house of a significant quantity of drugs was strong. Defendants, moreover, were not ultimately prejudiced regarding the drug

amount. *See Robinson*, 547 F.3d at 636–38; *Watson*, 620 Fed. App'x. at 508–09, 510. Under the governing tests, therefore, we decline to reverse the convictions because "proof of the [Defendants'] guilt [was] overwhelming" as it related to the conspiracy. *Francis*, 170 F.3d at 550.

**E.    Sentencing issues**

*1.       Sentencing manipulation and sentencing entrapment*

The Defendants argue that the Government's conduct in establishing the quantity of cocaine constitutes sentencing manipulation or sentencing entrapment in violation of fundamental fairness and their Fifth Amendment due process rights. We review constitutional challenges to a sentence de novo. *United States v. Graham*, 622 F.3d 445, 452 (6th Cir. 2010).

Prior to trial, the Defendants filed a joint motion seeking to preclude the enhancement of their sentences based upon the fictional amount of cocaine involved, alleging that it was selected specifically to increase their sentences. The trial court deferred ruling on the motion, finding it more appropriate to address at sentencing. At the sentencing hearing, the court overruled the objection, reasoning that the Sixth Circuit has not recognized sentencing entrapment or sentencing enhancement. The Defendants request this court to expressly recognize sentencing manipulation.

"Sentencing entrapment is similar to the subjective theory of entrapment and 'focuses on the defendant's lack of predisposition to commit the greater offense.'" *United States v. Hammadi*, 737 F.3d 1043, 1048 (6th Cir. 2013) (citing *United States v. Strickland*, 342 Fed. App'x 103, 107 (6th Cir. 2009)). On the other hand, sentencing manipulation "tracks the objective theory of entrapment, and 'focuses on the [g]overnment's conduct.'" *Id.* (citing *Strickland*, 342 Fed. App'x at 107). The Sixth Circuit has not yet recognized either sentence

manipulation or sentence entrapment. *Hammadi*, 737 F.3d at 1048 (6th Cir. 2013) (noting that under the facts of the case, it "need not decide whether to adopt or reject these doctrines"). We decline to resolve that question here and leave it for another day.

### 2. *Consideration of § 3553(a) factors*

Alexander argues that his sentence was procedurally unreasonable because the district court failed to consider his request for a downward departure under the sentencing manipulation argument and because the district court did not adequately discuss or apply the 18 U.S.C. § 3553(a) factors. The sentence itself is reviewed for reasonableness, under an abuse of discretion standard. *See Gall v. United States*, 552 U.S. 38, 46, (2007). The sentence ultimately chosen by the court may be unreasonable if the court committed significant procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* at 51. "[T]he question is whether '[t]he record makes clear that the sentencing judge listened to each argument,' 'considered the supporting evidence,' was 'fully aware' of the defendant's circumstances and took 'them into account' in sentencing him." *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc) (quoting *Rita v. United States*, 551 U.S. 338, 358 (2007)).

Alexander first argues that the district court should have considered sentencing entrapment when determining his sentence. This issue was briefed, and the district court heard argument at the sentencing hearing but overruled the objection because "the Sixth Circuit has repeatedly noted that it has never recognized sentencing entrapment or sentencing enhancement." As noted, we decline to resolve those issues here and leave them for another day.

Alexander's second contention is that the court failed to meaningfully apply the § 3553(a) factors. The court stated that it thoroughly reviewed the pre-sentence investigation report, the sentencing memorandum, and the response to the memorandum. At the sentencing hearing, Alexander's trial counsel brought up his background, drug addiction, and poverty. The district court discussed the nature of the conduct, § 3553(a)(1), and the need for a harsher punishment in light of the crime and the intention to use firearms in the home, § 3553(a)(2). It noted the need to send a message to the community about this kind of activity, and that this "very significant sentence" reflected the seriousness of the crime. § 3553(a)(2). The court did not discuss directly the kinds of sentences available, but did instruct Alexander to participate in drug treatment and work toward a GED after release. § 3553(a)(3). It discussed the sentencing range based on the guidelines. Additionally, the court heard argument and ruled that Alexander should not be afforded acceptance of responsibility, but also ruled that he would not receive the four-level enhancement for his role as an organizer/leader in the offense, pursuant to USSG §3B1.1(a). § 3553(a)(4).

The district court did not mention the factors by name, though it appeared to hear argument or consider many of them. Clearer reference to the factors is preferable, and the court also might have addressed the guideline policy statements and the need to avoid unwarranted sentencing disparities, § 3553(a)(5) & (6). Our cases do not require a "ritualistic incantation of the § 3553(a) factors." *See United States v. Chandler*, 419 F.3d 484, 488 (6th Cir. 2005). Here the court's review of the factors was adequate. Alexander's sentence was procedurally reasonable.

F.       **Sufficiency of the evidence**

*1.       Drug quantity*

Maxwell, Nichols, and Chappell argue that there was insufficient evidence supporting the jury's drug quantity determination. They contend that because the agreement was to rob the stash house and split the eight to nine kilograms of cocaine equally between the Defendants and Zayas, they could only be found responsible for between four and four and a half kilograms of cocaine. We review de novo the district court's denial of the Defendants' motions for judgment of acquittal challenging the sufficiency of the evidence. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000). We view the evidence in the light most favorable to the Government and then consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[W]e do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994). Instead, we resolve all credibility issues in favor of the verdict and draw every reasonable inference in favor of the prosecution. *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001). "[A]ny fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013).

Zayas testified that his understanding of the plan was that the Defendants would distribute half of the drugs to him "subsequent" to robbing the entire amount. There was evidence in the record showing that the amount of cocaine involved in the conspiracy was between eight and nine kilograms. *See Robinson*, 547 F.3d at 636–37; *Watson*, 620 Fed. App'x. at 508–09, 510 (6th Cir. 2015) (stating that "the relevant quantity of drugs is the quantity

involved in the overall conspiracy"). Taken in the light most favorable to the Government, there was sufficient evidence to support the jury's drug amount determination.

2. *Chappell's convictions*

Chappell also asserts that the evidence admitted at trial was not sufficient to establish beyond a reasonable doubt that he joined the conspiracy to possess with intent to distribute five kilograms or more of cocaine or that he carried a firearm during, and in relation to, a drug trafficking crime. In support, Chappell argues that he knew Alexander for only a few days, Zayas spent only a brief time with him, Chappell was not paying attention during the conversation in the car, and he did not walk towards the vehicle that was going to be used in the robbery when the men exited the car. The Government responds that Chappell was in the car carrying a loaded firearm, Zayas explained the details of the plan and Chappell participated in that conversation, and that Zayas offered Chappell a chance to withdraw and he did not. Chappell also argues that there was insufficient evidence to show that he carried a firearm in relation to the conspiracy, stating that the gun was for his protection. The Government responds that Chappell brought his weapon, knew that there would be an armed guard at the house, and did not surrender his weapon when asked if he wanted to back out of the plan.

Taken in the light most favorable to the Government, we find that there was sufficient evidence for a rational jury to find that Chappell committed the charged offenses. *See Tocco*, 200 F.3d at 424.

**G. Motion to sever felon in possession charge**

Chappell argues that the court improperly denied his motion to sever his felon in possession of a firearm and ammunition charge from his drug conspiracy and knowingly using or carrying a firearm during and in relation to a drug conspiracy charges.

The denial of a motion to sever is reviewed for abuse of discretion. *United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996). Because Chappell failed to renew his motion to sever at the close of evidence, we review for plain error. *United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002). Plain error requires: (1) an error; (2) that was plain; and (3) affected substantial rights. *See United States v. Richards*, 659 F.3d 527, 546 (6th Cir. 2011). If these three conditions are met, we may exercise our discretion only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations omitted).

Chappell's argument centers around language in the district court's order denying severance, which uses the incorrect standard "in furtherance of" the drug conspiracy, instead of the correct standard "during, and in relation to" a drug conspiracy. The jury did not read this order and the proper language was used at trial. There was a sufficient connection for the offenses to be tried together, in light of the preference for joint trials of defendants who are indicted together in the federal system. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). We affirm the district court's denial of Chappell's motion to sever.

## H. Jury verdict form

Chappell argues that Count 6 of the jury verdict form failed to specify that the predicate drug trafficking offense must be the one alleged in the indictment. Because Chappell failed to object to the verdict form in district court, we review for plain error. *Lopez*, 309 F.3d at 971. Chappell's concern is that because the verdict form failed to specifically list the drug conspiracy that he was charged with in Count 2, the jury could have been misled and convicted him for using or carrying a firearm in order to commit a home invasion robbery. Chappell was never charged with robbery, however, only with drug conspiracy. There was no plain error in the jury verdict form.

## I.    Confidential informants

Nichols argues that the statements of confidential informants were hearsay, the court should have disclosed the identity of the informants, and the jury instructions regarding the confidential informants were defective.

### 1.    *Hearsay*

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003). "We have . . . sanctioned the use of . . . out-of-court [informant] statements to the extent that they are 'only offered to construct the sequence of events leading up to the drug transaction.'" *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997) (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)).

Nichols does not point us to any specific hearsay statements in the record. He argues generally that the informants' statements were hearsay because they were testimonial out-of-court statements offered against an accused to establish the truth of the matter asserted. The Government responds that the statements were offered to provide background information and were not for the truth of the matter asserted. In light of the generality of this claim and the standard of review, the district court did not abuse its discretion in admitting these statements.

### 2.    *Disclosure of confidential informants' identities*

Nichols also argues that the court should have ordered disclosure of the identities of the confidential informants. The decision whether to disclose the identity of confidential informants is generally left to the discretion of the trial court. *United States v. Cummins*, 912 F.2d 98, 103 (6th Cir. 1990). A court must balance public interest against the defendant's "right to prepare his defense," "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant

factors." *Roviaro v. United States*, 353 U.S. 53, 62 (1957). "[D]anger to the informant's life must be given significant weight in striking the *Roviaro* balance." *United States v. Straughter*, 950 F.2d 1223, 1232 (6th Cir. 1991). The defendant has the burden "to show how disclosure of the informant would substantively assist his defense." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992).

Nichols argues that the confidential informants directly engaged in the illegal activity and had contact with Nichols and other Defendants outside the presence of law enforcement. He alleges that these witnesses are the only people who could "controvert, explain, or amplify Zayas's and Johnson's report of these important conversations" in the car and that their evidence would have been helpful to the defense. The court found that the Defendants failed to provide specifics on how disclosure would assist their defense. It also reviewed documents from the Government in camera that showed disclosure would pose "grave danger" to the informants' safety. In balancing the factors, we find that the district court did not abuse its discretion.

3.    *Jury instructions*

Nichols argues that the jury instructions regarding evidence from the confidential informants were defective. We review a decision not to give a requested instruction for abuse of discretion, *United States v. Henderson*, 626 F.3d 326, 342 (6th Cir. 2010), but because Nichols failed to object to the instructions or to request specific instructions on informant testimony, we review for plain error.

Nichols argues that the jury should have been instructed to view the evidence about what the informants did or said with great caution, considering the benefits the informants expected to receive from the Government. The Government responds that any instruction would have been

confusing because the informants did not testify at the trial. The district court generally instructed the jury on witness credibility in the following way:

> Ask yourself if the witness had any relationship to the government or any of the defendants or anything to gain or lose from the case that might influence the witness's testimony. Ask yourself if the witness had any bias or prejudice or reason for testifying that might cause the witness to lie or to slant the testimony in favor of one side or the other.

(R. 182, PAGEID# 5714).

In *United States v. Wheaton*, 517 F.3d 350, 362 (6th Cir. 2008), the court found no plain error when the jury was given a similar instruction regarding witness bias and credibility, though no specific instruction was given in regard to informant testimony. We find no plain error occurred here.

## J.    Cumulative effect of errors

Nichols contends that even if each individual error did not constitute reversible error, the cumulative effect of the errors rendered the trial fundamentally unfair in violation of due process. This court reviews the cumulative effect of harmless errors for whether they were "so prejudicial" as to render the trial "fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983). We cannot say that the harmless errors here, even if accumulated, rendered the trial fundamentally unfair.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the Defendants' convictions and sentence.

**JANE B. STRANCH, Circuit Judge, concurring.** I write separately to express my discomfort with the governmental operation known as a "stash house sting." The sting that targeted these Defendants is one in a long list of nearly identical operations conducted by the ATF across the country. Brad Heath, *ATF Uses Fake Drugs, Big Bucks to Snare Suspects*, USA Today (June 28, 2013, 11:26 AM), https://www.usatoday.com/story/news/nation/2013/06/27/atf-stash-houses-sting-usa-today-investigation/2457109/ (noting that more than 600 individuals have been prosecuted following similar "stash house stings"). Because these stings are wholly inventions of law enforcement agents, they can and do include powerful inducements to participate in one big "hit," a hit that is conveniently large enough to qualify for mandatory minimum sentences. Obtaining the outsized reward is also made to look easy—the agent is a disgruntled insider who knows when and how to stage these "rip-and-runs" and offers to provide all needed assistance, from manpower to transportation. The unseemly nature of the Government's activity is emphasized by its failure to achieve its declared goals of jailing dangerous criminals and making our streets safer. Evidence showing that these hurry-up set-ups achieve the stated goals was not proffered and the facts here demonstrate why: no known dangerous individuals or criminal enterprises were researched or targeted and no pre-existing drug rings or conspiracies were broken up. In fact, this sting trapped Flowers, a gainfully employed young man with no criminal record. We have this result because informants were simply sent out into the community to gather information and find someone who would bite at the opportunity to make loads of money quickly. And, in line with sting statistics, the men recruited here were all African American and all from impoverished areas—as are the overwhelming number of stash-house-sting targets across the nation.

This concerning ATF tactic has rightly drawn criticism in news reporting, scholarly writing, and from the judiciary.  An investigative report from USA Today explored the risks and high costs associated with the stings, and the assurance that defendants involved would receive lengthy sentences.  Heath, *supra* ("USA TODAY reviewed thousands of pages of court records and agency files, plus hours of undercover recordings. Those records—many of which had never been made public—tell the story of how an ATF strategy meant to target armed and violent criminals has regularly used risky and expensive undercover stings to ensnare low-level crooks who jump at the bait of a criminal windfall.")

Scholarly writing has also criticized the stings, noting that the government does not have to "target existing criminal enterprises or have prior suspicion of potential targets," that it has "full control over the amount of time its targets spend in prison because it can specify the amount of drugs involved in the fictional conspiracies," and that the tactic has a disproportionate effect on poor minority defendants.  *See* Marc D. Esterow, Note, *Lead Us Not into Temptation:  Stash House Stings and the Outrageous Government Conduct Defense*, 8 Drexel L. Rev. 1, 28–31 (2016); *United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner., J, concurring and dissenting) (*citing* Katherine Tinto, *Undercover Policing, Overstated Culpability*, 34 Cardozo L. Rev. 1401 (2013)) (referring to these stings as a "disreputable tactic" and noting that "[l]aw enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences").  The effect on poor minority communities is the subject of litigation in the United States District Court for the Northern District of Illinois, where a recently filed expert report concludes that there was a clear pattern of racial disparities in Illinois sting cases, and finds that the disparities are inexplicable on grounds other than race.  Report of

Jeffrey Fagan, Ph.D., 1:12-cr-00632, R. 510-2.  A motion to dismiss based on racially selective law enforcement is currently pending in that court.  R. 518.

Despite increasing awareness of the problems and inequities inherent in fictitious stash house stings, at issue here is whether an appropriate legal path exists for a defendant to successfully challenge the stings.  A majority of circuits have recognized the outrageous government defense, but impose such a high burden on defendants that the defense rarely results in dismissal of charges.  *See United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002); *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011); *United States v. Twigg*, 588 F.2d 373, 377 (3d Cir. 1978); *United States v. Hasan*, 718 F.3d 338, 343 (4th Cir. 2013); *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003); *United States v. Boone*, 437 F.3d 829, 841 (8th Cir. 2006); *United States v. Black*, 733 F.3d 294, 303–04 (9th Cir. 2013); *United States v. Dyke*, 718 F.3d 1282, 1287 (10th Cir. 2013); *United States v. Augustin*, 661 F.3d 1105, 1122–23 (11th Cir. 2011); *United States v. Hsia*, 81 F. Supp. 2d 7, 19 (D.D.C. 2000).

In *United States v. Black*, the Ninth Circuit examined a stash house sting and, despite reservations, affirmed the district court's determination that the operation did not constitute outrageous government conduct because the defense is "limited to extreme cases" where the government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice."  733 F.3d at 298, 302.  There, the same ATF agent, Richard Zayas, orchestrated a sting, telling a familiar story:  he was a disgruntled drug courier who suggested robbing a cocaine stash house guarded by two men, at least one of whom would be armed.  *Id.* at 298–301.  The day of the proposed robbery, the defendants arrived at the agreed upon location and were arrested, then convicted of conspiracy to possess cocaine with intent to distribute and use of a firearm in furtherance of a drug trafficking offense.  *Id.* at 297–98.

Despite affirming, the court was troubled:

> The crimes of conviction . . . resulted from an operation created and staged by ATF. Most of the hard evidence against the defendants consisted of words used at meetings Zayas set up . . . . Zayas invented the scenario, including the need for weapons and for a crew, and the amount of cocaine involved. The only overt actions by the defendants involved showing up at meetings, including arriving at the parking lot with four hidden, loaded weapons and then driving to the storage warehouse where they were arrested. Although those actions clearly corroborate the defendants' intent to carry out an armed robbery, defendants were responding to the government's script.

*Id.* at 302–03.

The court was also concerned with how the government recruited the defendants. The ATF was not "infiltrating a suspected crew of home invasion robbers, or seducing persons known to have actually engaged in such criminal behavior." *Id.* at 303. Rather, the ATF found the defendant by "trolling for targets," sending the informant to "cast his bait in places defined only by economic and social conditions." *Id.* Also as here, the court recognized that agents can guarantee long sentences for defendants:

> In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant . . . . The ease with which the government can manipulate these factors makes us wary of such operations in general . . . .

*Id*. at 303 (citing *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010)); *see also* Heath, *supra*.

I find the concept of these "stash house sting" operations at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law. I am heartened that judges increasingly are objecting to these sting operations and prosecutors are responding. *See, e.g. United States v. McLean*, 199 F.Supp.3d 926 (E.D. Penn. 2016); Michael Tarm, *Federal prosecutors drop dozens of stash house sting charges*, AP (Jan.

30, 2015), available at http://www.msn.com/en-us/news/crime/federal-prosecutors-drop-dozens-of-stash-house-sting-charges/ar-AA8Lxuy.   As noted, multiple disciplines have proposed methods to address the injustices that appear to be an integral part of stash house sting operations, particularly those relating to sentences.[1]   Yet it seems we remain without an established vehicle in the law to define a dividing line between law enforcement practices that are honorable and those that are not.  In the interim, these questionable schemes continue to use significant government resources and to adversely impact the poor, minorities, and those attempting to re-integrate into society.  And they apparently do so with no increase in public safety and no deterrence of or adverse effect on real stash houses.  These costly and concerning sting operations do not accord with the principles of our criminal justice system and I hope they will be discontinued.

---

[1] *See, e.g.*, Sensenbrenner-Scott SAFE Justice Reinvestment Act, H.R. 2944 (114th Cong., 1st Sess. (2015)) (would permit a sentencing court to disregard the quantity and type of drug that was determined by an agent soliciting the defendant to participate in a stash-house robbery).