RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0346p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee*,

　　　*v.*

MOHANAD HAMMADI,

　　　　　　　　*Defendant-Appellant.*

No. 13-5189

_____

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:11-cr-00013-2—Thomas B. Russell, District Judge.

Argued: November 19, 2013

Decided and Filed: December 17, 2013

Before: MOORE, GIBBONS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** James A. Earhart, Louisville, Kentucky, for Appellant. Joseph F. Palmer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** James A. Earhart, Louisville, Kentucky, for Appellant. Joseph F. Palmer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. The government caught Defendant-Appellant, Mohanad Hammadi, as part of a sting operation in Bowling Green, Kentucky. It charged him with ten terrorism-related and two immigration offenses. He pleaded guilty. At sentencing, Hammadi asked the district court to depart downward from the guidelines-recommended sentence of life imprisonment on the basis of sentencing entrapment and sentencing manipulation. The district court refused to do so and

1

imposed a life sentence. Hammadi now appeals and argues that the district court erred by not adjusting his sentence downward. Despite Hammadi's request to the contrary, we need not decide whether to recognize these doctrines now because Hammadi would not qualify for a departure under either one. The district court, therefore, did not abuse its discretion, and we **AFFIRM** Hammadi's sentence.

## I.

Hammadi's story, as in many terrorism cases, begins with someone else. In 2009, the Federal Bureau of Investigation launched an investigation of Waad Ramadan Alwan—an Iraqi national living in Bowling Green—after his fingerprints appeared on fragments of an improvised explosive device ("IED") in Iraq. During the investigation, the FBI introduced Alwan to a confidential human source ("CHS"), who met with Alwan and recorded their conversations starting in August 2010. The CHS led Alwan to believe that the undercover government agent was part of a group sending money and weapons to the Mujahidin—Muslims engaged in Jihad, a holy war against infidels—in Iraq. During their conversations, Alwan described his past actions as an insurgent in Iraq to the CHS, including his use of IEDs and sniper rifles against American soldiers.

Between September 23, 2010 and January 10, 2011, Alwan assisted the CHS in sending what Alwan believed to be money and weapons to the Mujahidin several times. By January 11, 2011, Alwan was asking to lead the Bowling Green cell of the CHS's fictional terrorist organization. The CHS instructed Alwan to recruit others, and afterward Alwan approached multiple people whom he suspected of having violent, anti-American views. Several individuals rebuffed his offers to join the cell. Hammadi accepted. Alwan then took Hammadi to meet with the CHS and vouched for Hammadi as an experienced Iraqi insurgent.

In Iraq, as Hammadi would later tell the CHS and the FBI, he had participated in approximately ten IED attacks on American troops and convoys with at least two different cells, including al Qaida. Hammadi had been arrested for one of the IED attacks, but bribed his way free and fled to Syria. Once in Syria, he applied for refugee

status in order to immigrate to the United States.  On March 1, 2009, in a "Sworn Statement of Refugee Applying for Admission into the United States form," Hammadi answered "no" when asked if he had engaged in terrorist activity before.  Presentence Report ("PSR") at 13, ¶¶41–42. Similarly, in December 2010, when asked on his application for a green card if he had engaged in terrorist activity, Hammadi answered "no."  These two answers represent the conduct charged in Counts 11 and 12 in the Superseding Indictment.  *See* R. 62 at 6–7 (Page ID #334–35).

Hammadi entered the United States in July 2009, initially settling in Las Vegas with the help of a Catholic charity.  He had $900 to his name, brought only a carry-on bag filled with belongings, and spoke little English.  He failed to find employment, moving eventually to Bowling Green to work at a poultry factory.  Hammadi did so on the recommendation of Alwan, whose family he knew from Iraq and whom he had met in Syria.  Hammadi eventually quit his work at the poultry factory, and he claimed to be indigent when Alwan approached him about joining the fictional terrorist cell in January 2011.

For whatever reason, Hammadi agreed to accompany Alwan to a meeting with the CHS on January 25, 2011.  At that meeting, the CHS explained the scheme for sending money and weapons to insurgents in Iraq, and Hammadi made recommendations as to how to accomplish their objectives.  Then, on January 27, Hammadi and Alwan took $100,000 from the CHS and transported the money to a tractor trailer, believing that it would then find its way to the Mujahidin in Iraq.  This conduct violated 18 U.S.C. § 2339A and served as the basis for Count 1.  *See* R. 62 (Super. Indictment at 1) (Page ID #329).

On February 15 and 16, Hammadi and Alwan packed two rocket-propelled grenade launchers ("RPGs"), two machine guns, two boxes of plastic explosives, and two sniper rifles into duffel bags.  The CHS informed them that these weapons were intended for al Qaida in Iraq.  Hammadi and Alwan then took the weapons and placed them in hidden compartments of another tractor trailer, attempting to send the weapons

to terrorists, in violation of 18 U.S.C. §§ 2339A and 2339B.  This conduct served as the basis for Counts 2 and 3.  *See* R. 62 (Super. Indictment at 1–2) (Page ID #329–30).

After they delivered the weapons, the CHS told Hammadi and Alwan that they might ship surface-to-air missiles in the future.  Hammadi responded with enthusiasm, expressing his support for sending such missiles given that one of his terrorist cells in Iraq had acquired eleven of them.  On March 15, the CHS instructed Hammadi and Alwan that they would send two Stinger-missile systems as a test run, and the next day, Hammadi and Alwan loaded the Stingers into another tractor trailer.  These actions also violated 18 U.S.C. §§ 2339A and 2339B and made up the basis of Counts 4 and 5.  *See* R. 62 (Super. Indictment at 2–3) (Page ID #330–31).  Furthermore, their conspiracy to deliver the surface-to-air missiles violated 18 U.S.C. § 2332g, which the government charged in Count 10.  *Id.* at 5–6 (Page ID #333–34).

Following the delivery of the Stinger missiles, Hammadi and Alwan transported money and weapons—supplied by the CHS and the government—on two other occasions in violation of 18 U.S.C. §§ 2339A and 2339B.  This conduct served as the basis for Counts 6, 7, 8, and 9.  R. 62 (Super. Indictment at 3–5) (Page ID #331–33).  Hammadi and Alwan also plotted to murder a U.S. Army Captain whom they knew from Iraq, and Hammadi admitted to being a member of the "Tandheem," a common euphemism for al Qaida in Iraq.  PSR at 12, ¶¶36–37.  During the last delivery on May 25, the FBI arrested Hammadi and Alwan.

A grand jury indicted Hammadi on the twelve counts discussed above.  *See* R. 62 (Super. Indictment at 1–10) (Page ID #329–338).  When negotiations over a plea agreement broke down, Hammadi pleaded guilty without a plea agreement.  The probation office interviewed Hammadi and drafted a PSR, which calculated his offense level at 43—the maximum under the guidelines.  In Hammadi's sentencing memorandum, he asked the court to depart downward from the guidelines-recommended life sentence, claiming that the government's conduct constituted sentencing entrapment and sentencing manipulation.  R. 108 at 10–13 (Page ID #592–95).  While he admitted that this circuit has never adopted these doctrines, he nonetheless argued that the district

court should do so in his case because Hammadi, alone, lacked the intent or means to acquire, sell, or transport the Stinger missiles. *Id.* at 11–14 (Page ID #593–96). At the sentencing hearing, counsel elaborated, stating at various points that Hammadi had no real experience with Stinger missiles, that the government manipulated the contraband to trigger a mandatory minimum sentence of twenty-five years, and that Hammadi was motivated only by his indigence.

The government argued that the record disproved each of these assertions. First, Hammadi made several statements on February 16 that contradicted his claims of ignorance regarding Stinger missiles. Second, the government noted that Hammadi transported the Stinger missiles in mid-March and continued to attempt to provide material assistance to terrorists for another two months before being arrested, which the government believed undercut Hammadi's argument of sentencing entrapment. Furthermore, the government argued that Hammadi's statements and admissions under oath regarding his past terrorist actions in Iraq demonstrated his predisposition to commit the charged crimes. Finally, the government pointed out that Hammadi was actually paid only $750, which occurred months into this scheme. In sum, the government opposed a downward departure and advocated for the guidelines-recommended sentence of life imprisonment.

The district court considered this information, including Hammadi's background in Iraq, his prior bad acts, and his circumstances in the United States. It reviewed the 18 U.S.C. § 3553(a) sentencing factors in detail and Hammadi's arguments in his sentencing memorandum and at the hearing. Significantly, the district court found that this circuit has not recognized the doctrines of sentencing entrapment or sentencing manipulation, and concluded that, even if we had, the doctrines would not apply here because Hammadi failed to carry his burden of showing inducement and a lack of predisposition. Therefore, the district court sentenced Hammadi to "a term of life [imprisonment] as to Count 10 in the indictment, 180 months as to Counts 1 through 9, and 120 months as to each of Counts 11 and 12, to run concurrently with each other, for

a total term of life imprisonment." R. 123 (Sent. Hr'g Tr. at 76:12–17) (Page ID #708). Hammadi now appeals his sentence.

## II.

Since *United States v. Booker*, 543 U.S. 220 (2005), we review sentences for procedural and substantive reasonableness. *United States v. Camacho-Arellano*, 614 F.3d 244, 246 (6th Cir. 2010). We consider first whether the district court committed procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Id.* at 246–47 (quoting *Gall v. United States*, 552 U.S. 38, 51(2007)) (alterations in original). Second, we examine the substantive reasonableness of the sentence, reversing if the § 3553(a) factors considered together "do not justify the sentence imposed." *United States v. Coleman*, 627 F.3d 205, 210 (6th Cir. 2010) (citing *United States v. Bowers*, 615 F.3d 715, 725 (6th Cir. 2010)). "Regardless of whether the sentence imposed is inside or outside the Guidelines range, [we] must review the sentence under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51. "Only if [we are] firmly convinced that the district court erred is there a[n] abuse of discretion." *Coleman*, 627 F.3d at 211 (citing *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001)). We "generally do[] not review a refusal to grant a downward departure unless 'the district court (1) improperly computed the guideline range; (2) was unaware of its discretion to depart downward from the guideline range; or (3) imposed the sentence in violation of law or as a result of the incorrect application of the Sentencing Guidelines.'" *United States v. Fearnow*, 468 F. App'x 466, 469 (6th Cir. 2012) (quoting *United States v. May*, 399 F.3d 817, 827 (6th Cir. 2005)).

## III.

Hammadi's main argument on appeal is that the district court erred by failing to depart downward from the guidelines-recommended sentence of life imprisonment because of sentencing entrapment or sentencing manipulation. In the past, we have

never before recognized these theories as valid reasons to depart downward. *See, e.g.*, *United States v. Guest*, 564 F.3d 777, 781 (6th Cir. 2009); *United States v. Gardner*, 488 F.3d 700, 716–17 (6th Cir. 2007); *United States v. Coleman*, 188 F.3d 354, 360 n.6 (6th Cir. 1999) (en banc); *United States v. Mason*, 124 F.3d 201, at *3 (6th Cir. 1997) (Table). Today, we agree with the district court that Hammadi would not qualify for a departure under either theory, and therefore we need not decide whether to adopt or reject these doctrines.

These theories spring from the affirmative defense of entrapment and represent the two conceptions of the doctrine. *United States v. Strickland*, 342 F. App'x 103, 107 (6th Cir. 2009). At the most basic level, defendants pleading entrapment, or one of its derivative theories, argue that they should escape, or receive a lesser, punishment because the government's conduct induced them to commit the crime. *See United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010); *Mason*, 124 F.3d at *3. While defendants pleading the substantive defense of entrapment claim that they had no intent to break the law (minus government inducement), defendants pursuing the mitigating theories argue that, but for outrageous government conduct, the defendant would have committed only a less serious crime. *See Mason*, 124 F.3d at *3. Sentencing entrapment is similar to the subjective theory of entrapment and "focuses on the defendant's lack of predisposition to commit the greater offense." *Strickland*, 342 F. App'x at 107 (citing *United States v. Sanchez*, 138 F.3d 1410, 1414 (11th Cir. 1998)); *see also Sosa v. Jones*, 389 F.3d 644, 647 (6th Cir. 2004) (describing the subjective theory of entrapment). Sentencing manipulation, in contrast, tracks the objective theory of entrapment and "'focuses on the [g]overnment's conduct.'" *Strickland*, 342 F. App'x at 107 (quoting *Sanchez*, 138 F.3d at 1414). Under either theory, the defendant bears the burden of proof as to his lack of predisposition and to the outrageousness of government conduct. *See United States v. Jernigan*, 59 F. App'x 647, 650 (6th Cir. 2003); *United States v. Parrilla*, 114 F.3d 124, 127 (9th Cir. 1997).

The district court did not err in deciding that Hammadi would not qualify under either approach. First, Hammadi's guilty plea forecloses his argument that he is entitled

to a departure based on sentencing entrapment or manipulation.  Hammadi's sentence is not the result of the government tricking him into trafficking in a greater *quantity* of contraband.[1]  Instead, Hammadi's sentence is the result of his conspiring to traffic in a different *kind* of contraband at different times, which serves as the basis for a separate crime that requires a longer sentence.  If he lacked the intent to deal in surface-to-air missiles as charged in Count 10, he needed to assert the substantive defense of entrapment.  He did not.  Rather, he pleaded guilty, waiving any substantive entrapment defense.  *United States v. Cottage*, 307 F.3d 494, 499 (6th Cir. 2002) ("A voluntary and unconditional guilty plea generally waives any non-jurisdictional claims that arose before the plea, including the defense of entrapment.").  Hammadi now claims, under the guise of sentencing entrapment and manipulation, that he lacked the requisite intent to deal in Stinger missiles.  However, this argument undercuts his guilty plea and is identical to a substantive entrapment defense.  Hammadi has already waived that defense and cannot relitigate it at sentencing or on appeal.

Second, even if Hammadi has not waived his sentencing entrapment and manipulation arguments, he has not carried his burden of proving that he was not predisposed to commit the more egregious crimes charged in the indictment, particularly Count 10.  In the past, we have looked to a number of factors to determine predisposition, such as "the character or reputation of the defendant"; "whether the suggestion of the criminal activity was initially made by the [g]overnment"; "whether the defendant was engaged in the criminal activity for profit"; "whether the defendant evidenced reluctance to commit the offense"; and "the nature of the inducement or

---

[1]For example, if the CHS encouraged Hammadi to transport a particular number of Stinger missiles to trigger a mandatory minimum, then Hammadi might be able to invoke one of the mitigation theories and cite U.S.S.G. § 2D1.1 cmt. n.26(A). This application note allows a court to depart downward from the guidelines-recommended sentence if a drug defendant can prove that the government agent intentionally manipulated the quantity of drugs exchanged with the purpose of triggering a larger sentence. *Id.* Importantly, in drug cases, the amount of drugs possessed, manufactured, or sold determines the length of the sentence. *See, e.g.*, 21 U.S.C. § 841(b)(1)(A) (mandatory ten-year minimum sentences based on weight of certain drugs). In material-assistance cases, such as Hammadi's, the penalties are determined largely irrespective of the amount of assistance. Furthermore, it is unclear whether sentencing entrapment as a concept makes sense outside the drug context. As the D.C. Circuit has written, "[c]onsider a defendant who agrees with an undercover agent to murder someone for a fee. Are we to suppose that if the defendant initially offered only to beat the person up, he should be sentenced as if that were his offense?" *United States v. Walls*, 70 F.3d 1323, 1329 (D.C. Cir. 1995).

persuasion supplied by the government." *United States v. Khalil*, 279 F.3d 358, 365 (6th Cir. 2002) (internal quotation marks omitted). An analysis of these factors clearly shows predisposition. As the district court recognized, Hammadi boasted repeatedly of his prior terrorist activities in Iraq and demonstrated familiarity with Stinger missiles and other explosives. R. 123 (Sent. Hr'g Tr. at 74: 22–75:16) (Page ID #706–07). Additionally, Hammadi never balked at taking part in the scheme, unlike others whom Alwan tried to recruit. And as we have noted, "the ready commission of the criminal act amply demonstrates the defendant's predisposition." *United States v. Kussmaul*, 987 F.2d 345, 349 (6th Cir. 1993) (quoting *Jacobson v. United States*, 503 U.S. 540, 550 (1992)) (emphasis deleted). Finally, the record undermines Hammadi's claims that indigence drove him to commit the offense, because it shows that he was paid only $750 and after multiple deliveries had been made. *See* R. 123 (Sent. Hr'g Tr. at 53:11–20) (Page ID #685). Given these facts, the district court did not abuse its discretion by refusing to depart downward on account of sentencing entrapment because these admissions would support a finding of predisposition.

Third, Hammadi has also failed to prove by a preponderance of the evidence that the government's conduct was so outrageous as to present a due-process concern. The government's conduct in this case is not irregular, and Hammadi offers no evidence that the government acted purposefully to trigger a twenty-five-year mandatory minimum. Since September 11, 2001, the government has maintained that these sting operations are necessary to root out potential domestic terrorists, and part of those investigations is "testing to see just how far these defendants would go in committing acts of terrorism." *United States v. Cromitie*, 727 F.3d 194, 227 (2d Cir. 2013). While the judiciary should not rubberstamp executive conduct based on blanket claims of necessity, the Supreme Court has recognized that the entrapment defense "was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." *United States v. Russell*, 411 U.S. 423, 435 (1973). As a result, courts have given the government "wide latitude . . . in conducting sting operations . . . ," *United States v. Rizzo*, 121 F.3d 794, 801 (1st Cir. 1997), remembering that "[w]here the [g]overnment simply gives the defendant '[the]

opportunity to commit a crime,' and the defendant accommodates by committing a crime, the entrapment claim is unavailable," *Kussmaul*, 987 F.2d at 349 (quoting *Jacobson*, 503 U.S. at 550). Here, the government's conduct sits squarely within this latitude; its tactics do not shock the conscience. *Cf. Rochin v. California*, 342 U.S 165, 172 (1952). The government provided Hammadi with an opportunity to commit a crime, and he took it. Accordingly, we hold that the district court did not abuse its discretion in refusing to depart downward based on sentencing manipulation.

**IV.**

For these reasons, we **AFFIRM** the sentence imposed by the district court.