RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-2415

DARRYL JACKSON,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cr-00083-1—Robert Holmes Bell, District Judge.

Decided and Filed: December 5, 2017

Before: GUY, MOORE, and ROGERS, Circuit Judges.

_____

**COUNSEL**

_____

**ON BRIEF:** Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Kate Zell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court in which ROGERS, J., joined. GUY, J. (pp. 16–18), delivered a separate dissenting opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Guns have the potential to make a bad situation worse. In light of that reality, the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") prescribe harsher penalties for defendants who have "used or possessed any

firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). This case principally presents the question whether that sentencing enhancement applies to Defendant-Appellant Darryl Jackson, who made two pairs of separately negotiated sales—each including one sale of a small amount of drugs, one of a gun—to a government informant in close succession, but without bringing both a gun and drugs to either sale or having reason to anticipate that the first sale would beget the second. This case also presents the question whether the district court committed plain error by failing to consider sentencing-factor manipulation as a ground to reduce Jackson's sentence. Although we find no plain error with regard to sentencing-factor manipulation, we conclude, despite giving due deference to the district court, that Jackson did not use or possess either gun in connection with either sale of drugs within the meaning of § 2K2.1(b)(6)(B). We thus **VACATE** the application of the four-level enhancement under § 2K2.1(b)(6)(B) and **REMAND** this case for resentencing.

## I. BACKGROUND

The facts in this case are not materially in dispute. On October 28, 2015, a confidential informant ("CI") in Grand Rapids, Michigan, told law enforcement that drugs were available for purchase from someone named "Dlite." R. 26 (PSR at ¶ 12) (Page ID #67). "Dlite" turned out to be Jackson, and nearly a month later, on November 23, an undercover agent drove the CI to a property in Grand Rapids to meet Jackson and purchase approximately a gram of heroin from him. R. 26 (PSR at ¶¶ 12–13) (Page ID #67). Jackson sold the CI the gram of heroin for $120. R. 35 (Plea Tr. at 13) (Page ID #127). After this exchange was completed, the CI told Jackson that the CI was "in a little bit of a pickle" and asked Jackson if he knew where the CI could "pick up a pistol." R. 24 (Gov't Obj. to PSR at 2) (Page ID #59). Jackson initially demurred, but soon indicated that he had a gun for sale. *Id.* The two negotiated a price of $400, and while the CI went to the undercover agent's car to obtain the full amount, *id.*, Jackson "walked down [the street] to his own residence . . . to get the gun and then returned" to make the second exchange, R. 39 (Sentencing Tr. at 7) (Page ID #176); *see also* R. 39 (Sentencing Tr. at 9) (Page ID #178); R. 26 (PSR at ¶¶ 13–14) (Page ID #67).

A few days later, on November 27, Jackson told the CI that he had another gun for sale. R. 26 (PSR at ¶ 15) (Page ID #67). The undercover agent again drove the CI to meet Jackson at

the property where they had previously met, and the CI there purchased a second gun from Jackson for $500. *Id.* After the two had completed the exchange and Jackson had finished explaining to the CI how the gun worked, the CI asked Jackson if he wanted another customer to whom he could sell drugs. R. 24 (Gov't Obj. to PSR at 4) (Page ID #61). Jackson said that he did. *Id.* The CI indicated that this potential customer—the undercover agent in the car—had money to buy the drugs, and that Jackson could "come out to the car and meet him." R. 24 (Gov't Obj. to PSR at 5) (Page ID #62). The CI then left the property with the pistol and returned to the undercover agent's car. *Id.* "Shortly thereafter, the defendant also exited" the property, "walked to the same vehicle, and got inside." *Id.* Jackson "had a short conversation with the CI and the undercover agent and . . . sold the undercover agent one-half gram of heroin[], for $45." *Id.*; *see also* R. 35 (Plea Tr. at 20) (Page ID #134); R. 39 (Sentencing Tr. at 7–8) (Page ID #176–77).

On December 17, 2015, law enforcement executed a search warrant on the two properties involved in these sales. At one, they discovered $3,050 "and a plastic spoon with heroin residue." R. 26 (PSR at ¶ 17) (Page ID #67). At the other, they discovered a relative of Jackson's who "admitted to flushing a small quantity of marijuana and cocaine base down the toilet when he heard officers entering the residence." R. 26 (PSR at ¶ 18) (Page ID #68). The relative identified these quantities as "approximately $10.00 worth of marijuana and $25.00 worth of cocaine base" and said that they had been left on the kitchen table by Jackson. *Id.* No guns were recovered, and the relative stated that he had not ever seen Jackson with a gun. *See id.*

In April 2016, Jackson was indicted on two counts of being a felon in possession of a firearm and two counts of distribution of heroin. R. 12 (Indictment) (Page ID #22–25). He pleaded guilty without a plea agreement. R. 35 (Plea Tr. at 2) (Page ID #116). On October 3, 2016, he was sentenced in the district court. R. 39 (Sentencing Tr. at 1) (Page ID #170). The Presentence Investigation Report ("PSR") that was prepared in advance of the hearing calculated Jackson's total offense level to be 25 and his criminal history category to be VI, recommendations that correspond to a suggested imprisonment range of 110 to 137 months. R. 26 (PSR at 22) (Page ID #85). The PSR included in this calculation a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B) for "us[ing] or possess[ing] a firearm in connection with

another felony offense, to wit:  Distribution of Heroin."  R. 26 (PSR at ¶ 30) (Page ID #69). Jackson objected to this enhancement, arguing that "[t]he guns and the drugs were not connected in any way, except to the extent that Mr. Jackson sold each of them, at different times, to the CI." R. 23 (Def. Obj. to PSR at 2) (Page ID #57).  At the sentencing hearing, Jackson's counsel reemphasized this objection, arguing:  "In terms of the furtherance, there's no close proximity. There's no drugs and guns next to each other.  They're basically separate transactions."  R. 39 (Sentencing Tr. at 14) (Page ID #183).[1]

The district court was not persuaded, stating that counsel was "talking about a production of a drug and a production of a gun from the same person on or about the same time," R. 39 (Sentencing Tr. at 15) (Page ID #184), and concluding that "the basic framework of a felon in possession of a firearm and a distribution of heroin and the drug in connection with the sale of hard drugs is clearly met here," R. 39 (Sentencing Tr. at 16) (Page ID #185).  Nevertheless, the district court departed downward by ten months from the lower bound of the Guidelines' recommendation, imposing a sentence of 100 months.  R. 39 (Sentencing Tr. at 25) (Page ID #194).  Had the court ruled that the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) was not applicable to Jackson, the recommended sentencing range, in light of Jackson's criminal history category of VI, would have been 77 to 96 months.  *See* U.S.S.G. § 5A (sentencing table). Jackson appealed.

## II.  DISCUSSION

Jackson argues that the district court (1) improperly applied the four-level enhancement under §2K2.1(b)(6)(B) to his sentence, and (2) committed plain error by not detecting—and accordingly reducing his sentence on the basis of—sentencing-factor manipulation.  For the reasons that follow, we agree with Jackson's first argument and deny his second.

## A.  Standard of Review

"We review a district court's sentence for procedural and substantive reasonableness, applying the abuse of discretion standard."  *United States v. Seymour*, 739 F.3d 923, 929 (6th

---

[1]Jackson did not, in his written objections or at the hearing, argue sentencing-factor manipulation.  *See* R. 39 (Sentencing Tr.) (Page ID #170–98).

Cir. 2014). "Our review of procedural reasonableness includes determining whether the district court properly calculated a defendant's Guidelines range." *Id.*

"In the specific context of the § 2K2.1(b)(6)(B) firearm enhancement, 'we review the district court's factual findings for clear error and accord due deference to the district court's determination that the firearm was used or possessed in connection with the other felony, thus warranting the application of the . . . enhancement.'" *Id.* (internal quotation marks omitted) (quoting *United States v. Taylor*, 648 F.3d 417, 432 (6th Cir. 2011)). "The government bears the burden of establishing the factors supporting this enhancement by a preponderance of the evidence." *Id.*; *see also United States v. Shields*, 664 F.3d 1040, 1043 (6th Cir. 2011).

Where a defendant has "failed to preserve [a] procedural objection by first giving the district court the opportunity to address and remedy it, we review only for plain error." *United States v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015). "To demonstrate plain error, an appellant must prove: (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.*

## B. The Four-Level Enhancement Under U.S.S.G. § 2K2.1(b)(6)(B)

This case turns on whether the four-level enhancement prescribed by U.S.S.G. § 2K2.1(b)(6)(B) applies to Jackson's conduct. The subsection provides for the enhancement to apply "[i]f the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense." *Id.* § 2K2.1(b)(6)(B). The accompanying notes clarify that this subsection applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively." *Id.* § 2K2.1 cmt. n. 14(A). Further, the enhancement applies "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug manufacturing materials, or drug paraphernalia." *Id.* § 2K2.1 cmt. n. 14(B).

We have outlined a number of fact situations that can fall within the "broad wording," *see United States v. Williams*, 601 F. App'x 423, 424 (6th Cir. 2015), of this provision. There is, for

example, the "fortress theory" (an example of "proximity"), which applies "if it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction." *United States v. Angel*, 576 F.3d 318, 321 (6th Cir. 2009) (quoting *United States v. Ennenga*, 263 F.3d 499, 503 (6th Cir. 2001)).  There is also "[s]weetening-the-pot" (an example of "facilitat[ion]"), which "occurs when firearms are added to a drug sale under circumstances that could cause the seller to believe that he would obtain a greater profit with a relatively low increase to the risk of detection by law enforcement." *United States v. Henry*, 819 F.3d 856, 869 (6th Cir. 2016).  And there is simple facilitation by exchange:  "[t]rading firearms for drugs," such that "but for the transfer of guns to the drug dealer, the drug distribution would never have occurred." *United States v. Sweet*, 776 F.3d 447, 450 (6th Cir. 2015).

On the other hand, "[p]ossession of firearms that is merely coincidental to the underlying felony offense is insufficient to support the application of" the enhancement, as is the simple "presence of drugs in a home under a firearm conviction." *United States v. Taylor*, 648 F.3d 417, 432 (6th Cir. 2011) (first quoting *Ennenga*, 263 F.3d at 503; then quoting *United States v. Hardin*, 248 F.3d 489, 501 (6th Cir. 2001)).  In other words, there must be (and thus the Government must prove by a preponderance of the evidence) "'a clear connection' between the gun that served as the basis for the conviction for felon in possession of a firearm and the gun possessed during the other offense that triggers the enhancement." *United States v. Goodman*, 519 F.3d 310, 322 (6th Cir. 2008) (quoting *United States v. Howse*, 478 F.3d 729, 733 (6th Cir. 2007)).

In the sections that follow, and in light of the lack of any indication that Jackson actually *used* a gun in connection with a drug sale, we discuss (1) Jackson's lack of actual or constructive possession of a gun in connection with the drug sales; (2) the lack of close proximity between any gun and any drugs and, relatedly, the inapplicability of the fortress theory; and (3) the lack of any way in which a gun facilitated a drug sale.

1.  **Lack of Actual or Constructive Possession of a Gun in Connection with the Drug Sales**

Even giving due deference to the district court's application of this case's undisputed facts to the language of the Guidelines, Jackson's sentence was procedurally unreasonable. Even if a defendant did not *use* a gun, the § 2K2.1(b)(6)(B) enhancement applies if the defendant actually or constructively "possessed the gun in connection with [the] felony." *See Hardin*, 248 F.3d at 498;[2] *see also Angel*, 576 F.3d at 321. Because the record reveals no reason to conclude that Jackson actually possessed or used either gun in connection with the two drug sales, we focus here on constructive possession.

"Constructive possession occurs when a person 'knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *Hardin*, 248 F.3d at 498 (quoting *United States v. Covert*, 117 F.3d 940, 948 (6th Cir. 1997)). Thus, for example, when police located a gun "on a nightstand," with "a bag of marijuana . . . next to the gun" and "54 grams of cocaine" in the same room, *id.* at 491, we ruled that it was permissible to apply the enhancement, regardless of formal ownership or actual possession, in light of the fact that the defendant had clearly intended to put himself in a position to exercise dominion and control over the gun in connection with his drug trafficking, *see id.* at 498–500. "The bedroom was the stash location for the cocaine, and . . . a readily accessible firearm was there if needed to protect the cocaine." *Id.* at 500.

Here, by contrast, Jackson's conduct does not reveal that he at any time had both "the power and intention . . . to exercise dominion and control" over a gun in connection with the sale of drugs. *See Hardin*, 248 F.3d at 498 (citation omitted). Key to this conclusion are the facts that Jackson appears to have kept his guns and drugs housed at separate locations, did not bring a gun *and* drugs together to either sale, and had no reason to believe that either initial sale for one of the two types of contraband would beget a sale of the other type. Take the first pair of sales: Jackson exchanged a gram heroin for money at one property and then, with the heroin out of his possession, learned that the CI also wanted to buy a gun. R. 24 (Gov't Obj. to PSR at 2) (Page

---

[2]At the time that *Hardin* was decided, the provision now found at § 2K2.1(b)(6)(B) was located at § 2K2.1(b)(5). *United States v. Seymour*, 739 F.3d 923, 929 & n.2 (6th Cir. 2014).

ID #59).  Not having a gun with him, Jackson walked to another property a block away to retrieve the gun that he then exchanged for money.  R. 24 (Gov't Obj. to PSR at 2) (Page ID #59); R. 26 (PSR at ¶¶ 13–14) (Page ID #67); R. 39 (Sentencing Tr. at 7, 9) (Page ID #176, 178). Because the gun was down the block during the initial heroin sale and because Jackson had no reason to expect there even *would* be a gun sale when he bought the drugs, there is no evidence that Jackson had either the power *or* the intention to exercise dominion or control over the gun in connection with this first sale of heroin.

During the second pair of sales, Jackson transferred a gun for money at one property and then, with the gun out of his possession, was asked if he wanted to sell a half-gram of heroin. R. 24 (Gov't Obj. to PSR at 4–5) (Page ID #61–62).  Jackson agreed, at which point the CI left the property and Jackson went to an unestablished location[3] to retrieve the heroin before walking to the car to exchange that heroin for money.  R. 24 (Gov't Obj. to PSR at 5) (Page ID #62). Thus, by the time Jackson knew that he might be engaging in a heroin transaction, he had already divested himself of the gun, which was by that point in the CI's possession.   There is, accordingly, insufficient evidence to conclude that Jackson intended to exercise dominion or control over a gun in connection with the second drug sale either.[4]   In the absence of even constructive possession—let alone actual possession or use—connected to drug trafficking, U.S.S.G. § 2K2.1(b)(6)(B) does not apply.  *See Hardin*, 248 F.3d at 498; *see also, e.g., Goodman*, 519 F.3d at 322.

### 2.   Lack of Proximity and Inapplicability of the Fortress Theory

Moreover, just as there is no evidence that Jackson ever possessed, actually or constructively, a gun in connection with either of the drug deals, there is likewise no indication that Jackson ever kept a gun in "close proximity" with drugs, *see* U.S.S.G. § 2K2.1 cmt. n.

---

[3]The heroin may have been located elsewhere within the property, but the record does not disclose if that was the case, and the Government has not put forward evidence to clarify the question.  It is possible that the drugs were buried outside, or hidden on a neighboring property, or kept in some other place.

[4]It is true, of course, that Jackson might have anticipated a potential drug sale at this second meeting, given that he had already sold heroin once to the CI.  But "[t]he government bears the burden of establishing the factors supporting this enhancement by a preponderance of the evidence," *Seymour*, 739 F.3d at 929, and it has not done so here.

14(B), or that he satisfied a close relative of this basis, the "fortress theory," *see, e.g.*, *Seymour*, 739 F.3d at 929 (observing that the "fortress theory . . . presume[s] that, under certain circumstances, guns in close proximity to drugs warrant the § 2K2.1(b)(6)(B) enhancement").

The fortress theory applies "if it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction." *Angel*, 576 F.3d at 321 (quoting *Ennenga*, 263 F.3d at 503). It rests on the commonsense rationale that "drug transactions" are "potentially dangerous," *United States v. Herron*, 554 F. App'x 388, 394 (6th Cir. 2014), and thus that keeping guns near one's drugs might not only serve to protect the drugs, *see, e.g.*, *Angel*, 576 F.3d at 321; *Ennenga*, 263 F.3d at 503, but might also "embolden the offender to carry a large amount of drugs, to show up at a location where the parties on the other side of the transaction are armed, and to ensure . . . that both the money and the drugs change hands," *Shields*, 664 F.3d at 1046.

While it is true, as the Government notes, Appellee's Br. at 10, that we have turned to "the fortress theory to uphold applications of the firearm enhancement where the defendant was engaged in drug trafficking or simply in a house associated with drug trafficking," we have generally done so in cases in which (1) large quantities of drugs have been found (2) "in close proximity to" the relevant guns themselves. *See Seymour*, 739 F.3d at 930 (citing cases); *see also* U.S.S.G. § 2K2.1 cmt. n. 14(B) (explaining applicability when "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia"); *Shields*, 664 F.3d at 1046 (discussing the importance of the "quantity" and "value" of the drugs at issue for assessing whether the enhancement should apply); *Angel*, 765 F.3d at 321 (discussing the importance of "proximity" and "easy access" for assessing whether the enhancement should apply (quoting *United States v. Oglesby*, 210 F. App'x 503, 506 (6th Cir. 2007))). For example, we upheld the imposition of the enhancement in *Angel* after agents found in the defendant's "upstairs bedroom . . . 81.2 grams of processed marijuana in two containers on the floor, drug paraphernalia, assorted ammunition, and three firearms—a 12-gauge shotgun, a loaded .22 caliber pistol, and a .32 caliber handgun with an altered serial number." 576 F.3d at 319; *see id.* at 322. We upheld the enhancement in *Hardin* after a gun was found next to a bag of marijuana and in the same

room as 54 grams of cocaine. 248 F.3d at 491. And we upheld the enhancement in *Herron* after authorities discovered "'numerous handguns, large amount of crack cocaine, as well as a large amount of powder cocaine' and 'several hundred dollars,'" 554 F. App'x at 390, inside the defendant's small house, *id.* at 393.[5]

By contrast, as Jackson points out, Appellant's Br. at 9–10, we have ruled application of the enhancement procedurally unreasonable where "[f]irst, Defendant had only a small amount of drugs in his possession, and the government admit[ted] that nothing in the record show[ed] that Defendant was engaged in any sort of narcotics trafficking," and "[s]econd, . . . Defendant was attempting to *sell*"—rather than keep for protection or intimidation—"his handgun," *Seymour*, 739 F.3d at 930–31. Though Jackson acknowledges that, unlike Seymour, he *was* engaged in narcotics trafficking, he argues that the other two features of our cases upholding the enhancements—large quantities of drugs and the purposeful keeping together of drugs and guns—do not apply to him. *See* Appellant's Br. at 9–10. We agree.

There is no evidence that Jackson ever actually kept a gun near his drugs. *See* R. 24 (Gov't Obj. to PSR at 2, 4–5) (Page ID #59, 61–62).[6] Rather, much as we concluded in *Seymour*, if Jackson sought to create a fortress for his small-time drug-dealing, he had a strange way of going about it. With regard to the second sale, Jackson is like the defendant in *Seymour*, where we said that a defendant "can hardly have been emboldened in his drug possession, or have hoped to protect his modest stash, while simultaneously attempting to rid himself of the

---

[5]We observed in *Herron*, it bears emphasizing, that "[m]ost importantly, the loaded firearm was located on the first floor where the drugs and drug paraphernalia were located"; we thus concluded that "[t]he most likely reason that Herron possessed the loaded weapon was to protect himself during potentially dangerous drug transactions." *United States v. Herron*, 554 F. App'x 388, 394 (6th Cir. 2014); *see also United States v. Taylor*, 648 F.3d 417, 433 (6th Cir. 2011) (upholding enhancement where evidence showed that "Taylor obtained the gun to protect himself and his possessions, which included a valuable quantity of cocaine base and cash"); *United States v. Huffman*, 461 F.3d 777, 788 (6th Cir. 2006) (upholding enhancement where evidence showed that "Huffman was staying at a known 'dope house,'" that he "purposefully kept the gun and ammunition nearby after [the house] was shot up the night before, and that the drug-dealing owner of the gun had entrusted Huffman with its care"); *United States v. Ennenga*, 263 F.3d 499, 504 (6th Cir. 2001) (upholding enhancement where the "district court reasonably concluded that Ennenga had 'established a system by which he could protect himself and his possessions in his basement apartment, which included his sizeable stash of marijuana plants'").

[6]Indeed, the evidence presented in this case is consistent with—and perhaps points in favor of—the theory that Jackson kept whatever drugs he had to sell at one property and whatever guns he had for sale at another property down the street.

weapon that could accomplish these goals." *Seymour*, 739 F.3d at 931. And by even stronger logic, with regard to the first sale, he "can hardly have been emboldened in his drug possession, or have hoped to protect his modest stash," by keeping a gun in a property down the block, where it could be of zero offensive or defensive use to him. *See id.* There is thus no reason to conclude that Jackson satisfies the "close proximity" basis for the enhancement, *see* U.S.S.G. § 2K2.1 cmt. n. 14(B), on the fortress theory or any other ground.

### 3. Lack of Facilitation

Similarly, there is no reason to believe that either "firearm . . . facilitated, or had the potential of facilitating," either heroin sale. *See* U.S.S.G. § 2K2.1 cmt. n. 14(A). As noted above, one way in which a gun can facilitate a drug sale is by "sweeten[ing] the pot," *Henry*, 819 F.3d at 869 (quoting *United States v. Davis*, 372 F. App'x 628, 630 (6th Cir. 2010)), which "occurs when firearms are added to a drug sale under circumstances that could cause the seller to believe that he would obtain a greater profit with a relatively low increase to the risk of detection by law enforcement," *id*. Thus, in a case in which a defendant purchased, among other transactions, "thirty-one tablets of Hydrocodone and a shotgun," *Davis*, 372 F. App'x at 628, we concluded "that § 2K2.1(b)(6) is broad enough to cover the sale of firearms as part of a drug deal," *id.* at 630, even though the defendant there had made other sales of only drugs, *id.* at 628, 630. Similarly, where "sales of the gun and the drugs were negotiated, at least in part, during the same meeting, and they occurred contemporaneously," we have likewise found sufficient justification to conclude that the guns facilitated the drug trafficking. *Henry*, 819 F.3d at 869. By contrast, in *Davis*, we noted that Davis's claim that there was no facilitation "might be more convincing if all the drug sales preceded the sale of the guns (and if the future sale of the guns played no part in greasing the wheels for the preceding drug sales)." *Davis*, 372 F. App'x at 630.

Jackson's conduct is unlike the conduct at issue in *Davis* and *Henry*, but much like *Davis*'s "more convincing" counterfactual. *See Davis*, 372 F. App'x at 630. Although the sales in each pair of transactions occurred in quick succession, each was a separate exchange for separate consideration—there were no joint sales, nor any joint negotiations. And there is no indication that either gun sale increased the profit of the corresponding close-in-time drug sale or induced either sale in any other way: the first drug sale, after all, occurred before the idea of a

gun sale was even introduced, and the second drug sale occurred after the second gun sale had been completed. *See* R. 24 (Gov't Obj. to PSR at 2, 4–5) (Page ID #59, 61–62). Neither, in other words, sweetened the pot.

Sweetening the pot is not the only way, of course, that a gun can facilitate a drug sale. In fact, as we have made clear, all that "use or possession of" a gun must do is "make the sale of the pills easier." *Henry*, 819 F.3d at 869; *see also id.* ("In the context of criminal law, to 'facilitate' generally means '[t]o make the commission of [ ]a crime[ ] easier.'" (quoting *Facilitate*, BLACK'S LAW DICTIONARY (10th ed. 2014))). In *Henry*, for example, we ruled that the joint sale of a rifle and a number of morphine pills met the standard for facilitation. *Id.* "Henry's agreement to sell the rifle had the potential to ensure that the pills were not purchased from a competitor," we explained. *Id.* "Additionally, a joint sale such as [the one Henry negotiated] can be expected to reduce the transaction costs attendant to each sale—e.g., by requiring less time per sale." *Id.*

For reasons similar to those just noted, however, Jackson's conduct does not meet this standard of facilitation. Because the first drug sale was concluded before the idea of a gun sale was even introduced, there is no way that the already-completed gun sale could have enticed Jackson's purchaser away "from a competitor." *See id.* And because the second gun sale was completed before the idea of a second drug sale was introduced, there is similarly no way that the second gun sale created the kind of competitive advantage that we identified in *Henry*. Meanwhile, the independence of both sales within each of the two pairs of sales created exactly the inefficiency that we said in *Henry* that a drug dealer might seek to *avoid*: it "requir[ed] [*more*] time per sale," not "less." *See id.*

Needless to say, of course, this was also not a situation in which there was facilitation or use through exchange—as, for example, in *Sweet*, a case in which "defendants traded the firearms for drugs." *Sweet*, 776 F.3d at 448; *see also United States v. Harris*, 552 F. App'x 432, 438 (6th Cir. 2014) (affirming enhancement where defendant "traded [a] firearm for cocaine"). There, we observed, "but for the transfer of guns to the drug dealer, the drug distribution would never have occurred." *Sweet*, 776 F.3d at 450; *see also Harris*, 552 F. App'x at 438 ("[B]ut for the firearm, [Harris's dealer] would not have sold [him] the cocaine."). Here, there is no such

causal inference to be made:  the sales were independent, and there is no reason to conclude that but for either gun sale, there would not have been a drug sale.  The first gun sale, after all, was raised after the first drug sale was completed, and the second gun sale was completed before the second drug sale was raised.  No sale was contemplated by the parties, in other words, while another sale was open for discussion.

The Government nevertheless argues that this causal inference is justified in the context of the second drug sale.  Appellee's Br. at 15 ("[B]ut for the firearm sale on December 1, the heroin transaction would not have occurred.").  It contends that "[w]hile the firearm was not, as in *Sweet*, part of the consideration for the drug transaction, the firearm sale on December 1 was a literal 'but for' cause of the heroin transaction."  *Id.*  Presumably, the Government's theory here is that if the CI had not arranged to purchase a gun from Jackson on December 1, then the CI would not have been there, with Jackson, to begin to negotiate—after the gun sale was completed for separate consideration—a separate exchange for drugs.

This theory misunderstands but-for causation, a causal test that provides that "an act (omission, condition, etc.) was a cause of an injury if and only if, but for the act, the injury would not have occurred."  Richard W. Wright, *Causation in Tort Law*, 73 CAL. L. REV. 1735, 1775 (1985).  "That is, the act must have been a necessary condition for the occurrence of the injury." *Id.*; *see also United States v. Miller*, 767 F.3d 585, 605 (6th Cir. 2014) ("[T]he pertinent inquiry is always this:  in the absence of the cause or factor at issue, would the statutorily prohibited outcome have occurred?").  Here, there is no proof that but for the arrangement to purchase a gun on December 1, the CI would not have negotiated a drug transaction.  It is just as possible that, if Jackson had no gun to sell that day, the CI still would have sought to arrange a drug purchase, much the same way the CI contacted Jackson to arrange a drug sale the first time.

Although Jackson did sell both a gun and drugs in quick succession, the Government's burden was to prove that he "used or possessed" the gun "in connection with" his drug dealing, U.S.S.G. § 2K2.1(b)(6)(B), for example by "facilitat[ing]" it or "ha[ving] the potential of facilitating" it in some way, *id.* § 2K2.1 cmt. n. 14(A).  But the conduct here does not provide sufficient reason to conclude that these were anything but independent sales of guns and drugs— both illegal and rightly punishable, but not subject to the extra punishment that our laws reserve

for those who make the bad choice of mixing the two. *Cf. Smith v. United States*, 508 U.S. 223, 240 (1993) (observing that Congress, "was no doubt aware," in enacting harsh penalties for those who use or carry firearms while committing certain crimes, "that drugs and guns are a dangerous combination"). Jackson made many bad decisions as part of the events giving rise to this case, and he is paying the price for them. But the conduct at issue does not justify the conclusion that Jackson made the additional bad decision of "us[ing] or possess[ing] any firearm or ammunition in connection with" his drug trafficking offenses. *See* U.S.S.G. § 2K2.1(b)(6)(B). Accordingly, and giving due deference to the district court's ruling, we conclude that the four-level enhancement was procedurally unreasonable.

## C. Sentencing-Factor Manipulation

Jackson also argues that the district court committed plain error by failing, on its own, to reduce his sentence on the ground that the Government had committed sentencing-factor manipulation. Appellant's Br. at 14–16. This claim can be dealt with more briefly, particularly on the more deferential, plain-error standard of review that Jackson must overcome by virtue of having failed to make this argument to the district court. As noted above, plain error occurs when the district court makes an "obvious or clear" error that "affected defendant's substantial rights" and thus "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Coppenger*, 775 F.3d at 803. As Jackson and the Government agree, "sentencing factor manipulation . . . occurs when the government 'improperly enlarge[s] the scope or scale of [a] crime' to secure a longer sentence than would otherwise obtain.'" *United States v. DePierre*, 599 F.3d 25, 28–29 (1st Cir. 2010) (quoting *United States v. Vasco*, 564 F.3d 12, 24 (1st Cir. 2009)), *aff'd*, 564 U.S. 70 (2011). But as the Government notes, Appellee's Br. at 17–18, "we have never before recognized [this] theor[y] as [a] valid reason[] to depart downward." *United States v. Hammadi*, 737 F.3d 1043, 1048 (6th Cir. 2013). We would be hard pressed to say that the district court committed plain error by failing to apply sua sponte a doctrine that our circuit has never endorsed.

Even if we were to adopt the doctrine of sentencing-factor manipulation, the circumstances of Jackson's case would not qualify. As the Government observes, Appellee's Br. at 19, a defendant arguing sentencing-factor manipulation "bears the burden of proof as to his

lack of predisposition and to the outrageousness of government conduct," *Hammadi*, 737 F.3d at 1048. Here, at the very least, Jackson has not proven that the government's conduct was sufficiently outrageous to qualify. *See id.* at 1050 ("Here, the government's conduct sits squarely within [the] latitude [courts have given the government]; its tactics do not shock the conscience. The government provided Hammadi with an opportunity to commit a crime, and he took it." (citation omitted)). Accordingly, there was no plain error.

## III. CONCLUSION

Jackson's gun and drug sales lacked a connection sufficient to justify the district court's imposition of the four-level sentencing enhancement under § 2K2.1(b)(6)(B). Because the transactions at issue appear instead to have been independent and unanticipated sales—with no indication that a gun was ever actually or constructively possessed in connection with a drug sale, or kept near a stash of drugs, or facilitative of a drug sale—the enhancement did not apply to the conduct at issue and thus was procedurally unreasonable. Our holding today is a limited one: were there evidence that Jackson had come armed to sell drugs to the CI, or stored a gun with a stash of drugs, or traded a gun for drugs, or negotiated the sales of guns and drugs together, our precedents would likely justify the enhancement that the district court imposed. But these are not the case here. Instead, where from the beginning of the negotiation of each drug transaction until after it was fully consummated, the firearm in question was either a block away or in the exclusive possession of someone other than the defendant, the Guideline does not apply. We thus **VACATE** the district court's application of the four-level enhancement under § 2K2.1(b)(6)(B) and **REMAND** to the district court for resentencing.

_____

**DISSENT**

_____

RALPH B. GUY, JR., Circuit Judge, dissenting.  I believe defendant's second pair of transactions in narcotics and a firearm was sufficiently interconnected to justify imposing the enhancement.  I also believe the but-for causation standard does not apply to whether one sale "facilitated" the other.  Accordingly, I respectfully dissent.

On November 23, 2015, defendant sold the government's confidential informant ("CI") some narcotics, and then, after some prodding by the CI, a firearm.  Defendant had to walk down the block to retrieve the firearm before selling it to the CI.  I agree with the majority that this pair of sales was insufficient to trigger USSG § 2K2.1(b)(6)(B).

On November 27, 2015, Jackson contacted the CI and offered to sell the CI another firearm.  The CI agreed, and on December 1, 2015, the CI went to the same residence at which he previously met with defendant.  Immediately after the CI and defendant completed the firearm sale, the CI offered to introduce defendant to his companion — who was waiting in the car — so that defendant could sell him narcotics.  Defendant accepted the offer, telling the CI, "you go to the car and I'll be over there."  The CI returned to the car, and "[s]hortly thereafter, the defendant also exited [the residence], walked to the same vehicle, and got inside."  Defendant then sold narcotics to the CI's companion.

The firearm enhancement can apply "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia."  USSG § 2K2.1 cmt. n.14(B).  The majority concludes that defendant lacked actual or constructive possession of the firearm in connection with the drug trafficking felony.  Key premises to the majority's analysis are "the facts that [defendant] seems to have kept his guns and drugs housed at separate locations, did not bring a gun *and* drugs together to either sale, and had no reason to believe that either initial sale for one of the two types of contraband would beget a sale of another type."

The district court, however, did not abuse its discretion by finding otherwise. At the December 1 sale, defendant was observed delivering the narcotics after leaving the same residence from which he had just sold the firearm (and from which he had sold narcotics on November 23). These facts comprise circumstantial evidence that defendant brought narcotics to the December 1 firearm sale, and there is no evidence to the contrary.[1] *See United States v. Wilder*, 615 F. App'x 351, 354 (6th Cir. 2015) (observation that defendant's errand to sell narcotics originated at his home was evidence that he stored narcotics at his home, supporting § 2K2.1(b)(6)(B) enhancement). Moreover, defendant indeed had "reason to believe" that such a joint sale would take place: a week prior, he made a nearly identical joint sale to the CI. Finally, it bears repeating that defendant was *trafficking* narcotics, not merely possessing them — a fact that lowers the government's burden when it seeks application of the enhancement. *See United States v. Seymour*, 739 F.3d 923, 930 (6th Cir. 2014); *United States v. Berkey*, 406 F. App'x 938, 940-41 (6th Cir. 2011). Accordingly, I would hold that the district court did not abuse its discretion by applying the enhancement on the basis that defendant possessed the firearm in connection with the drug trafficking felony.

In the alternative, the majority holds that "there is no reason to believe that either firearm 'facilitated, or had the potential of facilitating,' either heroin sale." With respect to the December 1 transaction, I disagree. Facilitation can be found when a defendant becomes a "one-stop-shop for [drugs] and firearms." *United States v. Davis*, 372 F. App'x 628, 630 (6th Cir. 2010) (quoting *United States v. McGill*, 139 F. App'x 201, 204 (11th Cir. 2005)). "[T]he fact that the sales of guns and drugs are negotiated as separate items does not prevent them from 'essentially amount[ing] to a single transaction.'" *United States v. Henry*, 819 F.3d 856, 869 (6th Cir. 2016) (quoting *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002)). Both of these principles are at work here. Defendant and the CI arranged the sale of the narcotics during the same meeting at which the firearm was sold. The fact that a thin line can be drawn between

---

[1]The majority places a burden on the government to "clarify the question" of whether the firearm was located in the same residence as the drugs on December 1. But requiring the government to conclusively refute the possibilities "that the drugs were buried outside, or hidden on a neighboring property, or kept in some other place" fails to account for the evidence that the drugs were in the same residence, and the lack of evidence that they were stored somewhere else.

the two sales has little practical import.**2** The sale of the narcotics took place because the CI — primarily there to buy a firearm but equipped with the knowledge that defendant sold drugs, too — utilized the opportunity to avail himself of both facets of defendant's "one stop shop."

The majority rejects the government's argument that, "[b]ut for the firearm sale on December 1, the heroin transaction would not have occurred," on the basis that the government did not actually satisfy the but-for test for causation. However, we have held that "[b]ut-for causation is not the applicable standard under § 2K2.1(b)(6); all that is required is that the firearm 'facilitated, or had the potential of facilitating, another felony offense.'" *Id.* (quoting USSG § 2K2.1 cmt. n.14(A)). Because defendant's possession of the firearm "ma[d]e the sale of the [drugs] easier" by bringing a drug customer to defendant's doorstep, the facilitation test is satisfied. The government's failure to show but-for causation is immaterial. *Id.*; *see also Davis*, 372 F. App'x at 629 (demonstrating the enhancement applies is "not a particularly onerous burden").**3**

Finally, the decision whether to apply the firearm enhancement or not requires an examination of the totality of the circumstances. *Henry*, 819 F.3d at 866 (citing *United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999)). Here, the totality of the circumstances includes the fact that defendant made *two pairs* of transactions in firearms and narcotics. Although the first pair of transactions, standing alone, was insufficient to impose the enhancement, its existence supports the district court's conclusion that defendant's possession of a firearm facilitated, or had the potential to facilitate, his drug trafficking felony.

---

**2**Although the majority suggests that the bifurcated transaction was "inefficient," any inefficiency was nominal. The record does not reflect any material inconvenience to defendant, as opposed to the November 23 sale, which required defendant to retrieve the firearm from another residence.

**3**The majority cites two cases in which a but-for connection between the drug and gun sales was sufficient to impose the enhancement. *United States v. Sweet*, 776 F.3d 447, 450 (6th Cir. 2015); *United States v. Harris*, 552 F. App'x 432, 438 (6th Cir. 2014). As *Henry* makes clear, however, recognizing that a but-for connection may be sufficient to impose the enhancement does not mean it is necessary to impose the enhancement if no such connection exists.