NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0060n.06

No. 20-6269

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| *Plaintiff-Appellee*, | ) | Feb 01, 2022 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| DAREL DEXTER, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| *Defendant-Appellant*. | ) | DISTRICT OF TENNESSEE |
| | ) | |

Before: BOGGS, GRIFFIN, and MURPHY, Circuit Judges.

BOGGS, Circuit Judge. Appellant Darel Dexter pled guilty to being a felon in possession of a firearm. During his sentencing, the trial court added two enhancements—one for using the firearm in connection with another felony and one for having three prior "violent felony" convictions under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). Although the first enhancement was properly applied, the second enhancement rested on an insufficient analysis of prior state-court convictions. We therefore vacate Dexter's sentence and remand for resentencing.

## I. BACKGROUND

Darel Dexter pled guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Underlying this charge was a multi-day period of violence culminating in Dexter's flight from pursuing authorities.

It began on November 28, 2018, when Tomika Sesley called the police. She told them that Dexter, her ex-boyfriend and the father of her children, had arrived at her apartment and threatened

to assault her and "shoot up" the place. Dexter had left by the time police arrived, but while the officers were on the scene, Dexter called Sesley and threatened her again.

The next day, November 29, Dexter arrived at Sesley's apartment to drive their pregnant daughter to the hospital. After he dropped their daughter off at the hospital, he repeatedly called Sesley and threatened to "shoot up" the apartment. Later that day, police responded to a call from Sesley. Someone had fired a handgun at the apartment. A witness reported that Dexter was responsible.

Early in the morning on November 30, police responded to a vandalism complaint at Sesley's apartment. The officers met Bernard Speed, Sesley's then-boyfriend, who stated that his windshield had been smashed. While he did not witness the vandalism, he explained that Dexter had called Sesley to tell her that he broke Speed's window to prevent him from driving.

Later that morning, police again responded to a call at Sesley's apartment. She reported that someone had fired a shotgun into her bedroom window while she and Speed were inside. Police observed shotgun shells within a few feet of the window and front door. An anonymous witness told police that Dexter was possibly the culprit.

The next day, Dexter returned and threatened Speed with a shotgun. Speed retreated into Sesley's apartment, but later emerged and discovered Dexter sitting in his parked car down the street. Speed managed to flag down some passing police officers, and together they approached Dexter in his car. The officers noticed a shotgun on the passenger seat, secured it, and began questioning Dexter. When officers ordered him out of the vehicle, Dexter sped off. In his flight, he drove onto the sidewalk and came close to striking Speed with the vehicle. Months later, detectives tracked down and arrested him.

Dexter subsequently pled guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The Probation Office prepared a presentence investigation report ("PSR").[1] The PSR calculated Dexter's base offense level as 20 and added two levels pursuant to USSG § 2K2.1(b)(4)(A) because the firearm was stolen and another two levels pursuant to USSG § 3C1.2 for reckless endangerment while fleeing from law enforcement. Three levels were subtracted for acceptance of responsibility.

The PSR also contained two other recommendations, both of which are at issue in this appeal. First, it added a four-level enhancement pursuant to USSG § 2K2.1(b)(6)(B) for using a firearm in connection with another felony offense (aggravated assault). Second, it recommended that he be classified as an armed career criminal for having at least three prior convictions for violent felonies committed on different occasions. Without application of the ACCA, Dexter's offense level would have been 25 with a criminal history category of III, leading to a guidelines range of 70-87 months of imprisonment. Application of the ACCA, however, would mandate an offense level of 34 (prior to the subtraction of two levels for acceptance of responsibility) and a criminal history category of VI, resulting in a guidelines range of 210-262 months of imprisonment.[2]

Dexter objected to both enhancements. Specifically, he maintained that he had not threatened Tomika Sesley, their children, or Speed, nor had he shot at them or the apartment. He also objected to the designation of two prior convictions as predicate offenses under the ACCA.

---

[1] Dexter calls attention to the fact that the Probation Office prepared two PSRs. The first noted that it was unclear whether the ACCA applied to Dexter because of "inconsistencies between the indictment and judgment" in one prior conviction. The Probation Office therefore requested the plea colloquy from the state court. The second PSR recommended that the ACCA enhancement be applied. The sentencing court referred to the second PSR.

[2] At the sentencing hearing, the government declined to move to subtract an additional level for acceptance of responsibility. Two, rather than three, levels were ultimately subtracted for a final offense level of 32.

At the sentencing hearing, the government presented evidence related to the factual under-pinnings of the (b)(6)(B) enhancement. It offered testimony from Tomika Sesley and her daughter Qulinda relaying Dexter's repeated threats of violence, as well as both of their signed statements to the police. It also offered photographs taken outside of Sesley's apartment showing shotgun shell casings and bullet holes. The district court ultimately concluded that the government had proved by a preponderance of the evidence that the shotgun taken from Dexter had been used in an aggravated assault against Tomika Sesley.

Dexter also contested the application of the ACCA enhancement. The PSR designated three prior convictions as predicate offenses. Dexter objected to classifying two of them as predicate offenses because state-court materials were ambiguous as to the underlying offense. After evaluating the state-court documents, the district court concluded that the two convictions did qualify as predicate offenses and that the ACCA enhancement was correctly applied.

Dexter was sentenced to 240 months of imprisonment and 2 years of supervised release and was ordered to pay a $100 special assessment. He timely appealed.

## II. ANALYSIS

We review a district court's sentence "for procedural and substantive reasonableness, applying the abuse of discretion standard." *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014). A review of procedural reasonableness "includes determining whether the district court properly calculated a defendant's Guidelines range." *Ibid.* In the specific context of a "§ 2K2.1(b)(6)(B) firearm enhancement, 'we review the district court's factual findings for clear error and accord due deference to the district court's determination that the firearm was used or possessed in connection with the other felony.'" *Ibid.* (quoting *United States v. Taylor*, 648 F.3d 417, 432 (6th Cir. 2011)) (quotation marks omitted).

**A. (b)(6)(B) Enhancement**

Dexter appeals the application of a four-level enhancement under USSG § 2K2.1(b)(6)(B). This enhancement applies to defendants who "[u]sed or possessed any firearm or ammunition in connection with another felony offense." *Ibid*. The PSR recommended the enhancement because Dexter used the shotgun in connection with the felony offense of aggravated assault. It stated: "Specifically, the defendant pointed the large shotgun at Bernard Speed. Additionally, the defendant fired a shot at Tomika Sesley's residence on November 29, 2018, and shot through Sesley's bedroom window on November 30, 2018."

Dexter argues that the evidence presented at the sentencing hearing was insufficient for the court to conclude that a firearm was used in connection with another felony offense. We disagree.

The application notes for § 2K2.1(b)(6)(B) define "another felony offense" as "any federal, state, or local offense, other than the . . . firearms possession . . . offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." USSG § 2K2.1(b)(6)(B), cmt. n.14(C).

But "[c]oincidental possession of a firearm during an offense will not suffice" to apply this enhancement. *United States v. Williams*, 601 F. App'x 423, 424 (6th Cir. 2015) (citing *Taylor*, 648 F.3d at 432). "[T]here must be (and thus the Government must prove by a preponderance of the evidence) 'a clear connection between the gun that served as the basis for the conviction for felon in possession of a firearm and the gun possessed during the other offense that triggers the enhancement.'" *United States v. Jackson*, 877 F.3d 231, 237 (6th Cir. 2017) (quoting *United States v. Goodman*, 519 F.3d 310, 322 (6th Cir. 2008)).

The district court concluded that the shotgun, which was the firearm at issue for Dexter's felon-in-possession charge, was used in connection with an aggravated assault.[3] The court found that Dexter fired the shotgun into Tomika Sesley's apartment on November 30. That finding is not clearly erroneous.

Dexter argues, however, that this finding was unsupported by the evidence presented during the sentencing hearing.[4] He notes that while courts may consider hearsay evidence during sentencing proceedings, the evidence must bear "some minimal indicium of reliability beyond mere allegation." He acknowledges that the government presented witness testimony at the sentencing hearing, but points out that the witnesses did not see him fire the shotgun and no evidence tied the shotgun shells found outside the home to his shotgun. The government also did not present any testimony from Bernard Speed indicating that Dexter pointed the shotgun at him.

Dexter is correct that the PSR's assertion that he pointed the shotgun at Speed was not confirmed at sentencing. That allegation, however, was not the basis of the district court's conclusion that the shotgun was used in connection with a separate felony. The court instead relied on the conclusion that Dexter fired the shotgun into Tomika Sesley's apartment.

On that point, the government presented evidence in the form of photographs and witness testimony. Dexter may believe that evidence was insufficient to meet the government's burden, but it was not mere allegation. The evidence was, moreover, sufficient for the district court to conclude that the government had met its burden.

---

[3] A debate arose at sentencing as to whether the firearm used in connection with another felony must be the same firearm that was the subject of the felon-in-possession charge. After a brief recess, Dexter's attorney conceded that the firearm need not be the same. Dexter appears to have forfeited that argument, but in any event, the district court concluded that the weapon used in connection with the aggravated assault was the same weapon subject to the felon-in-possession charge.

[4] Dexter does not argue that the alleged conduct—firing a shotgun into Sesley's apartment—would not be, if true, a felonious aggravated assault. We therefore assume that the conduct qualifies as a felony.

The evidence surrounding the firing of the shotgun consisted of testimony from Tomika and Qulinda Sesley as well as photographs of shotgun shells found outside of the apartment.

Tomika Sesley testified about the morning of November 30:

Q: So going back to the 30th, you said that . . . Mr. Dexter –

A: [W]hen we got home [the night of the 29th], [Dexter] wasn't anywhere to be found. We went into the house, phone calls all through the night, threatening what he was going to do, how he was going to do it. Just – I'm used to that, just threats, but that morning he showed up and shot through my bedroom window and it went through walls. It went through a fan. It went through another wall, another dresser, 2 inches from hitting my daughter in the stomach; and she was pregnant.

Q: Now where were you at the time that Mr. Dexter shot into the bedroom?

A: I was laying on the couch, at first asleep, and Qulinda came and got me told me come get in the bed. We didn't lay in the bed like you supposed to. We laid, like, across the bed. Time we laid down, bullets come flying through the window.

Q: Were the police called for any of these incidents?

A: Every time.

Q: And was Mr. Dexter still on the scene once the police—

A: We couldn't see him, but he did call the phone to let the police know while they were standing up there, taking pictures and doing what they was doing, that he can come up there and "F" them up, too, and it's nothing they can do about it.

She also testified on cross-examination that on the day prior to these events, November 29, Dexter called and threatened her, and then came to the apartment with a small handgun.

A: He took a little handgun and shot in my front window – I mean in my front door, which the bullets cannot come through because of the iron on the door.

Q: Okay. And you were home when this happened?

A: Yes.

Q: Okay. And you witnessed him –

A: I saw him shoot in my front door, but I did not see him shoot in my window [with the shotgun the next morning.]

Qulinda Sesley testified as follows regarding the shotgun firing:

Q: And were you home on the 30th of November of 2018?

A: Yes, ma'am.

Q: What happened? Take your time.

A: We be laying in the bed and it's, like, soon as I woke up and I told my momma to move her head that way, I started hearing shots and we got up and we ran into the next room to check on my sister and then I got the phone call from my dad [Dexter].

Q: Let's take it slow.

A: I got the phone call from my dad, saying he was sorry, he didn't mean to do it to me and my sister. He started telling me he was aiming for my mom and her boy-friend. I kept asking him why, and he just kept saying he was sorry. He didn't want to harm me and my sister. And I asked him why he want to harm my mama, and he said he wasn't going to stop until she was dead.

On cross examination, Qulinda admitted that she did not see Dexter shoot that night:

Q: Now tell me about November 30th. When this shooting occurred at the home –

A: Uh-huh.

Q: -- did you actually see your dad shooting?

A: No.

Q: Okay, but he's calling you, telling you that he's going to do it.

A: He didn't call to say he was going to do. He called and said he had already done it. The shooting had already happened.

True, neither Tomika nor Qulinda saw Dexter with the shotgun on November 30. But both testified that he called and admitted to being the perpetrator. And Tomika testified that the day before, Dexter had arrived and shot at her door with a different gun. It is also true that the govern-ment did not present any evidence tying the shells found outside Sesley's apartment to Dexter's shotgun through, e.g., ballistic evidence. But given the testimony from both Tomika and Qulinda,

the district court was entitled to draw the reasonable inference that it was Dexter who fired the shotgun, and that the shells belonged to the shotgun later found in his possession.

In making its finding of fact, the court also relied on testimony from both Tomika and Qulinda that Dexter frequently showed up to the apartment and threatened violence. The district court was entitled to judge the credibility of those witnesses and draw inferences from the circumstantial evidence that the shotgun was used by Dexter in an aggravated assault. As the court observed, "[i]f this were a trial issue, the proof probably would be insufficient; but our standard here is preponderance of the evidence." In other words, Dexter may have raised a reasonable doubt that he used the shotgun to commit an aggravated assault. But the reasonable-doubt standard is not applicable when applying the enhancement. We therefore hold that the district court's factual finding was not clearly erroneous and affirm the application of the (b)(6)(B) enhancement.

## B. ACCA Enhancement

Dexter also appeals the district court's characterization of him as an armed career criminal and the consequent enhancement. The ACCA imposes a 15-year mandatory minimum sentence for those who commit a felon-in-possession offense if the defendant "has three previous convictions . . . for a violent felony or a serious drug offense or both, committed on occasions different from one another[.]" 18 U.S.C. § 924(e)(1).

Violent felony is defined under the statute as:

> any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—
>> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

*Id.* § 924(e)(2)(B).

We review de novo whether a prior conviction is a violent felony under the ACCA. *United States v. Mitchell*, 743 F.3d 1054, 1058 (6th Cir. 2014). To determine whether a prior conviction constitutes a violent felony, a court must apply the "categorical approach." *Taylor v. United States*, 495 U.S. 575, 600 (1990). This approach looks to whether a particular offense is "categorically" a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Johnson v. United States*, 576 U.S. 591, 596 (2015). We consider only "the fact of conviction and the statutory definition—not the facts underlying the offense." *United States v. Bartee*, 529 F.3d 357, 359 (6th Cir. 2008).

Certain criminal statutes, however, are "divisible." That is, they consist of alternative elements, some of which may be categorically violent felonies, and some of which may not. Faced with a divisible statute, we apply the "modified categorical approach." Under the modified categorical approach, "a sentencing court looks to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). That limited class of documents is often referred to as *Shepard* documents, after the Court's ruling in *Shepard v. United States*, 544 U.S. 13 (2005).

Both approaches, categorical and modified categorical, require the court to look to the statutory definition of a conviction. The problem here is that the district court never tied Dexter's prior convictions to their respective statutory definitions. In 1990, Dexter pled guilty to a series of crimes, four of which were adjudicated simultaneously. Two of those were, according to the PSR and district court, predicate violent felonies. Dexter disputes that those two convictions were appropriately characterized: While it is clear which crimes he was indicted for, it remains unclear which crimes he pled guilty to. We agree that those two convictions remain ambiguous and remand

- 10 -

for the district court to first determine the statutory basis for these offenses and then to apply the categorical approach.

### 1. Conviction for Criminal Attempt: Murder Second

Dexter first disputes the conviction listed in paragraph 38 of the PSR. According to the PSR, Dexter was indicted for violating Tenn. Code Ann. § 39-12-101 after shooting the owner of a tire store during an attempted robbery. That statute describes the offense of criminal attempt. According to the 1990 judgment sheet, Dexter was indicted for "Criminal Attempt – assault to commit murder 1st" and convicted of "Criminal Attempt – assault to commit murder 2nd." During the 1990 plea colloquy, however, the trial court explained that Dexter was pleading guilty to "criminal attempt, murder second degree."

Dexter does not dispute that he was indicted under the criminal-attempt statute.[5] Instead, he suggests that the criminal-attempt statute replaced an older statute, which was repealed in 1989, prior to his indictment. He further claims that the *Shepard* documents cast doubt on whether he pled guilty pursuant to the then-current criminal-attempt statute, or the older statute.

The state-court documents describing this conviction are inconsistent: the plea colloquy identifies a different offense than the judgment, the judgment refers to an offense without a specific statutory basis, and the plea colloquy points to a combination of a generic attempt statute plus an uncited second-degree murder statute.

At the sentencing hearing, Dexter's attorney suggested that the inconsistency between the plea colloquy and the judgment sheet means that the conviction is ambiguous and cannot qualify

---

[5] Dexter disputes the ultimate classification of that conviction as a violent felony and he objects to the use of the Affidavit of Complaint as a *Shepard* document. However, he did not dispute the assertion that he was indicted under § 39-12-101 (the criminal-attempt statute). It is therefore an undisputed finding of fact. *See United States v. Armes*, 953 F.3d 875, 880 (6th Cir. 2020) (holding that courts may use formal charging documents to determine crime of conviction and may accept undisputed portions of presentence report as findings of fact).

as a violent felony. Resort to the *Shepard* documents is appropriate here, but only to the extent they can clear up the factual issue of which statute Dexter was convicted under.

It does appear that the district court made a limited factual finding on this conviction. After hearing arguments from both sides, the trial court concluded that the offense was "criminal attempt, murder second degree which is a B felony." This finding was supported by the record; the apparent error in the judgment sheet seems to have been cleared up during the 1990 plea colloquy. There, the state court asked Dexter's attorney what the charge was:

> Q: Is that criminal attempt, murder second, or is that criminal attempt assault to murder second.
> A: Criminal attempt, murder second. Murder second is a class "A" felony, so attempt would be one down, Your Honor.

The prior conviction to which the categorical approach should therefore be applied is "criminal attempt, murder second." But two more steps are still required; the court must identify which specific criminal offense is referred to by "criminal attempt, murder second degree" and then apply the categorical approach to that offense.

Criminal attempt, murder second does not correspond to a specific statute. The only statute referenced in the indictment is Tenn. Code Ann. § 39-12-101. That statute, at the time of Dexter's conviction, read:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.
(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

*Id.* (1991).

And while no statute is referenced relating to second degree murder, at the time of Dexter's conviction, second degree murder had its own statutory definition:

(a) Second degree murder is:
(1) A knowing killing of another; or
(2) A reckless killing of another which results from the unlawful distribution of any Schedule I or Schedule II drug when such drug is proven to be the proximate cause of the death of the user.
(b) Second degree murder is a Class A felony.

Tenn. Code Ann. 39-13-210 (1991).

It seems, therefore, that the charge "criminal attempt, murder second" is an amalgamation of two separate statutes: criminal attempt and second-degree murder. The Government suggests on appeal that "[w]hen a substantive offense would be a violent felony under § 924(e) and similar statutes, an attempt to commit that offense is also a violent felony." Appellee Br. at 11 (citing *Hill v. United* States, 877 F.3d 717, 719 (7th Cir. 2017)). But that principle is too broad—the court in *Hill* was applying the elements clause of the ACCA to a conviction for attempted murder under Illinois law. That holding cannot automatically apply to a Tennessee offense, since the categorical approach requires individualized analysis of a specific offense. *C.f. United States v. Taylor*, 141 S. Ct. 2882 (2021) (mem.) (granting certiorari to review whether attempted Hobbs Act robbery qualifies as a crime of violence under related law).

We do not comment on whether the offense of "criminal attempt, second degree murder" is categorically a violent felony. That question ought to be answered first by the district court on remand.

## 2. *Conviction for Aggravated Assault*

The conviction for attempted aggravated assault poses similar issues. The problem here is, again, that Dexter pled guilty to an offense different than the one he was indicted for.

The 1990 judgment sheet stated that Dexter was indicted for "Aggravated Assault." The offense of conviction was listed as "Attempt felony to wit Agg Assault." The plea colloquy describes Dexter as pleading guilty to "criminal attempt to commit aggravated assault." The indictment lists two counts, both referring to Tenn. Code Ann. § 39-13-102 without specifying a subsection.

That statute consists of multiple subsections, some of which are categorically violent felonies, and some of which are not. At the time of Dexter's conviction, § 39-13-102 read:

(a) A person commits aggravated assault who:

(1) Commits an assault as defined in § 39-13-101, and:

(A) Causes serious bodily injury to another; or

(B) Uses or displays a deadly weapon; or

(2) Being the parent or custodian of a child or the custodian of an adult, intentionally or knowingly fails or refuses to protect such child or adult from an aggravated assault described in subsection (a); or

(3) After having been enjoined or restrained by an order, diversion or probation agreement of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assualt [sic] against an individual or individuals, attempts to cause or causes bodily injury or commits or attempts to commit an assault against such individual or individuals.

(b) Aggravated assault is a Class C felony. The court shall consider as an enhancement factor at the time of sentencing that the victim of the aggravated assault was a law enforcement officer, firefighter, probation officer or parole officer performing an official duty.

Tenn. Code Ann. § 39-13-102 (1991).

The parties agree that the (a)(1) variant is categorically a crime of violence under the ACCA's use-of-force clause. *See Davis v. United States*, 900 F.3d 733, 738 (6th Cir. 2018). The government, moreover, concedes that the (a)(2) and (a)(3) variants are not.

At the sentencing hearing, Dexter objected to the classification of this conviction as a violent felony because it was unclear which subsection of the aggravated-assault statute he pled guilty to. Faced with this ambiguity, the sentencing court looked to the *Shepard* documents, as if it were applying the modified categorical approach. First it looked to the state indictment, which is composed of two counts. Count One states that Dexter intentionally caused the victim to reasonably fear bodily injury by use of a deadly weapon. Count Two of the indictment, on the other hand, states that Dexter attempted to cause bodily injury "having been enjoined by an Order of Protection." Count One of the indictment, therefore, appears to correspond to the (a)(1) variant while Count Two appears to correspond to the (a)(3) variant. Next, the judgment sheet indicates that Dexter pled guilty to Count One of the indictment. The district court then inferred that Dexter was convicted of the (a)(1) variant, which is categorically a violent felony.

But Dexter was not convicted for violating (a)(1). Instead, he pled guilty to some variation of attempted aggravated assault. The district court did not, however, make any clear finding of fact as to which statute Dexter was convicted of. At most, the court stated that Dexter "was convicted of attempt to commit a felony, to-wit aggravated assault . . . . [T]hat was the lesser included offense of Count One of the indictment [aggravated assault likely corresponding to variant (a)(1)], where the allegations were that it was committed by use of a deadly weapon." The district court should, on remand, make a finding of fact of which offense Dexter was convicted of and apply the categorical approach to that offense in the first instance.

That analysis will again require the district court to determine which statute Dexter was convicted under. The offense listed on the 1990 judgment sheet ("attempt to commit a felony, to-wit aggravated assault") did not correspond to any statutory offense in 1990. Dexter suggests that he was mistakenly convicted under an older statute ("attempt-to-commit-a-felony") which was repealed in 1989 (prior to his indictment) and replaced with the criminal-attempt statute (§ 39-12-101). He cites a case in which we held that Tennessee's older attempt-to-commit-a-felony statute is not a crime of violence. *Harper v. United States*, 780 F. App'x 236, 241 (6th Cir. 2019). That case provides a clue towards determining which statute Dexter pled guilty to.

In *Harper*, the defendant, like Dexter, had been indicted on a charge of aggravated assault. *Id.* at 240. When evaluating the ACCA enhancement, the district court "construed the attempt conviction as imposed pursuant to Tennessee's former aggravated-assault statute, which included the offense of attempted aggravated assault and provided for a sentence of two to ten years." *Ibid.* That was a mistake, since "[a]lthough the indictment charged Harper with aggravated assault, he did not plead guilty to aggravated assault and was not convicted of that crime." *Ibid.* Instead, he "pled guilty to the lesser-included offense of 'Attempt to Commit a Felony to wit: Aggravated Assault,' and was sentenced to one day per week in the local workhouse for a period of three months." *Ibid.* The court further observed that "[t]his sentence is consistent with a conviction under the attempt-to-commit-a-felony statute, not with the higher sentencing range under the aggravated-assault statute." *Ibid.*

In Dexter's case, the opposite is true. During the 1990 plea colloquy, the government explained that Dexter was "pleading guilty in indictment 90-06942, to the offense of attempt to commit aggravated assault, which is a class "D" felony [and] the State recommends two years [imprisonment.]" That recommended sentence is consistent with a charge under the aggravated-assault

statute, not the attempt-to-commit-a-felony statute, which, as we observed in *Harper*, provides for a lighter sentence. Moreover, the attempt-to-commit-a-felony statute had already been repealed by the time Dexter pled guilty.

But in 1990 there was no such offense as "attempted aggravated assault." Older versions of the aggravated assault statute defined the offender as any person who *attempts* to cause certain kinds of injuries. *See State v. Jackson*, 697 S.W. 2d 366, 370 (Tenn. Crim. App. 1985). When "attempt" was baked into the statute, it was impossible to "attempt the attempt." By 1990, though, the statutory scheme had been altered such that there existed the aggravated assault statute (§ 39-13-102) and the criminal attempt statute discussed above (§ 39-12-101).

It seems, then, that the statutory basis used for Dexter's conviction for the offense of attempted aggravated assault was an amalgamation of the criminal-attempt statute and the aggravated-assault statute. But the precise statutory basis remains unclear. We therefore remand for the district court to make a finding of fact of the statutory basis for Dexter's 1990 attempted aggravated-assault conviction. Moreover, while the district court applied the modified categorical approach to the aggravated-assault statute, it did not apply the categorical approach to the offense of *attempted* aggravated assault, whichever statute or statutes that offense may correspond to. We therefore remand to the court to conduct that analysis in the first instance.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's application of the (b)(6)(B) enhancement and REMAND to the district court for consideration of the application of the ACCA in accordance with the above.